In the Matter of the Receivership of MT. PLEASANT BANK & TRUST COMPANY, Mount Pleasant, Iowa.

FEDERAL DEPOSIT INSURANCE CORPORATION, As Receiver of the Mt. Pleasant Bank & Trust Company, Mount Pleasant, Iowa, Appellee,

v.

MOUNT PLEASANT PROFESSIONAL BUILDING; Don Boshart; Eldora Boshart; Eugene Barnes; Beulah Barnes; Home Furniture of Mt. Pleasant Corporation; Kenneth Tolander–Trustee; Richard Lane, Executor Juanita Lane Estate; Edwin Menke; Mary Lou Menke; Enterprise Design, Inc.; David Roth; Dorothy Roth; Florence Jennings; A. Leroy Jennings; R. Gaye Richenberger; Lawrence R. Walker; Lawrence E. Walker; Kelly C. Walker; Mt. Pleasant Utilities; Henry County Association for Retarded Citizens; Industrial Training Center; Donald Kiesey; Mary Kiesey; Richard H. Goodwin; Henry County, Iowa; Mt. Pleasant Community Theater Association; William O. Anderson; Esther I. Anderson; M & H Services, Ltd.; Hassenfritz Farms, Inc.; Walter Miller; Wanda Miller; and Messer Fertilizer, Inc., Appellants.

United Central Bank of Des Moines, N.A., now known as First Interstate Bank of Des Moines, N.A., Appellee.

No. 87–137.

Supreme Court of Iowa.

June 15, 1988.

Michael C. Vance, and David L. McCoid, Mt. Pleasant, for appellants.

Michael Noyes of Rehling, Lindburg & Gosma, Davenport, for appellee Federal Deposit Ins. Corp.

Ross H. Sidney, Robert C. Thomson, and Patrick J. McNulty of Grefe & Sidney, Des Moines, for appellee United Central Bank of Des Moines, N.A., n/k/a First Interstate Bank of Des Moines, N.A.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

The appellants in this declaratory judgment action are the owners of outstanding repurchase agreements bought from the now-insolvent Mt. Pleasant Bank & Trust Company (MPB). Among other things, they contend the district court erred by interpreting the agreements to preclude perfection of their security interests in the federal securities being used as collateral. As a result of the court's interpretation, the appellants' security interests were found to be unperfected, thus making the appellants only general creditors of MPB upon its insolvency. Because we believe the district court erroneously interpreted the agreements, we reverse and remand with directions to the district court.

## I. Background Facts and Proceedings.

Prior to its closing, MPB sold repurchase agreements to the appellants. Under these agreements MPB was unconditionally obligated to pay the purchaser on the repurchase date the amount of the principal plus interest.[1]

To secure MPB's performance, the agreements granted the purchaser a security interest in federal securities owned by MPB. These securities were bought and held for MPB by a correspondent bank, the United Central Bank of Des Moines, N.A. (UCB).[2]

1. These debt instruments are popularly known as "eighty-nine-day repurchase agreements." Federal banking regulations exempt from the definition of "deposit" such indebtedness of a bank when it " 'aris[es] from a transfer of direct obligations of, or obligations that are fully guaranteed as to principal and interest by the United States or any agency thereof, that the bank is obligated to repurchase and is ... [i]n denominations of less than $100,000, matures in less than 90 days and cannot be automatically renewed or extended.' " Porter, *Eighty–Nine–Day Agreements for the Sale and Repurchase of Fractional Interests in Government Securities*, 98 Banking L.J. 343, 343–44 (1981) (citing 12 C.F.R. §§ 217.1(f)(2)(ii), 329.10(b)(2)(b), 531.12 (1980)). In other words, these regulations allow "banks to sell a ... debt instrument whose rate of return is not limited by the deposit interest ceilings." *Id.* at 344; *see also* Comment, *The Need for a Uniform Classification of Repurchase Agreements: Reconciling Investor Protection with Economic Reality,* 36 Am.U.L.Rev. 669, 673–74 (1987).

While the underlying security being used as collateral is guaranteed by the federal government, it should be noted that the "government guarantee to pay the obligation evidenced by the underlying security flows only to the bank. The buyer has contracted to receive the repurchase price out of the bank's general funds and is not legally entitled to payments from any other source." Porter, 98 Banking L.J. at 364.

2. UCB is now known as the First Interstate Bank of Des Moines, N.A.

In this case, UCB bought federal securities on behalf of MPB because UCB was a member of the federal reserve system, while MPB was not. These securities, from certain federal agencies, were among those that federal banking regulations allow to be used as collateral under repurchase agreements. *See* Comment, 36 Am.U.L. Rev. at 669 n. 2. When the securities were sold

Each repurchase agreement was composed of a certificate, a disclosure addendum, and a security agreement. The addendum contained many of the repurchase agreement's terms. It provided that the purchaser was the equitable and beneficial owner of the collateral security until repurchased by MPB. UCB was named as the holder "in trust" of the security.

The certificate and addendum further provided that the "[p]urchaser's interest in the underlying federal security *is not perfected* and that *in the event of insolvency,* the customer may only be able to look to the *general assets* of the bank and *not to the underlying federal security.*" (Emphasis added.) The addendum also stated that the "obligation of the named bank is not guaranteed by the United States Government." In addition, as described in the certificate, a purchaser's principal was not considered a deposit and was therefore not insured by the Federal Deposit Insurance Corporation (FDIC).

On August 6, 1982, the Iowa superintendent of banking ordered MPB to cease business. *See* Iowa Code §§ 524.224, 524.226 (1981). The FDIC was subsequently appointed to be the receiver, *see id.* at §§ 524.226, 524.1310, 524.1313, and on August 8 it sold certain assets of MPB, including the securities used as collateral for the repurchase agreements, to the Hawkeye Bank & Trust Company.

This declaratory judgment action was then brought by the FDIC to determine whether the appellants had perfected security interests in the federal securities and should therefore be treated as priority creditors under Iowa Code section 524.1312(2). The appellants and UCB were named as respondents.

In addition, the appellants brought a cross-claim against UCB, contending that it had violated its duties to act as a trustee for their interests and to exercise reasonable care in giving advice to MPB about protecting those interests. UCB also cross-claimed against the FDIC as successor of MPB, arguing that UCB's liability under

the other cross-claim arose from MPB's negligence.

By agreement of the parties the case, including the cross-claims, was tried to the court as a law action.

At trial the appellants introduced parol evidence, without objection, in support of their argument that MPB representatives had characterized the security interests as perfected despite language to the contrary in the agreements themselves. Among this evidence was the stipulated testimony of the appellants:

1. At the time [the appellants] purchased their repurchase agreements from MPB, MPB made written and oral representations to the [appellants] which the [appellants] believed and relied upon, and thereafter they purchased their respective repurchase agreements.

2. That among these representations were the following:

(a) that the repos [i.e., repurchase agreements] were not insured by the FDIC;

(b) that the repos were safe investments because the repayment of the repos was guaranteed by the U.S. government/government agency securities or bonds specified as collateral in each repo agreement;

(c) [that] in some cases the [appellants] understood they actually owned a partial interest in said bonds ...;

(d) that the repo owners understood the representations meant that the only way the repo owner could lose was if the government of the United States failed and the bonds became worthless as a result.

Evidence was also introduced to show that the MPB president, Donald F. Carmody, had taken steps to specify that the securities were pledged as collateral under the repurchase agreements. After consulting MPB's attorney, Carmody spoke to a UCB employee who told him that the securities could be marked as collateral under UCB's standard procedure. Upon UCB's

to UCB, "book-entry" records were made instead of certificates being issued; hence, the securities

are referred to as "uncertificated." *See generally* 31 C.F.R. §§ 306.115–306.122 (1982).

request Carmody sent, several weeks be-. fore MPB went into receivership, a letter that said, in part: "We ask that you mark your records showing that the securities are pledged as security and that you not release these securities until the repurchases described have been repaid." UCB then marked the receipts for the securities with the legend "Pledged to: Consumer Repo."

The court concluded the language "purchaser's interest in the underlying federal security is not perfected" meant the parties intended that the appellants' security interests would never be perfected. Because of this interpretation, the court refused to consider the appellants' stipulated testimony and Carmody's communication with UCB. According to the court, "extrinsic evidence cannot be used to vary the terms of the security agreement. The bank's statements cannot be used to vary the written agreement stating that the repo owners' security interest was not to be perfected."

The court concluded the appellants had failed to show perfected security interests and were therefore only general creditors of MPB.

The appellants now argue that the court erred in its interpretation of the repurchase agreements and in not considering the extrinsic evidence described above. This evidence, the appellants maintain, shows that the parties to the repurchase agreements intended the security interests to be perfected. The appellants also argue that UCB, which had the federal securities in its possession, violated its duties to act as a trustee for the appellants' interests and to exercise reasonable care in giving advice to MPB about protecting those interests.

The FDIC, an appellee here, argues that the district court properly interpreted the repurchase agreements and properly excluded the extrinsic evidence from consideration. UCB, the other appellee, argues the court correctly found that UCB was not negligent and owed no duty to the appellants. Before considering these issues, we must first resolve the parties' disagreement over our scope of review.

## II. Scope of Review.

The appellants contend our review is de novo because the case was filed and tried in equity. Although this is a declaratory judgment action under Iowa Rule of Civil Procedure 267, we review it as any other judgment. *Mead v. Iowa State Bd. of Parole,* 331 N.W.2d 102, 103 (Iowa 1983). Our scope of review is governed by how the case was tried in the district court. *Halsey v. Coca–Cola Bottling Co. of Mid–America, Inc.,* 410 N.W.2d 250, 252 (Iowa 1987).

In this case the district court's pretrial conference order noted that "[a]ll parties to this proceeding agree that this is a law action." No objection was made to this order. The appellants also made a demand for a jury trial, belying their claim that this case was an equity action. And at trial the court ruled on objections as they were made, which is "the hallmark of a law trial, not an equitable proceeding." *Sille v. Shaffer,* 297 N.W.2d 379, 381 (Iowa 1980). We agree with the FDIC that our review is for correcting errors of law. *See* Iowa R.App.P. 4.

In a law action the district court's findings of fact have the effect of a special verdict and are binding on us if supported by substantial evidence. *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 238 (Iowa 1988). We are not bound, however, by the district court's application of legal principles or its conclusions of law. *State ex rel. Miller v. Internal Energy Management Corp.,* 324 N.W.2d 707, 710 (Iowa 1982).

## III. Perfection of Security Interest in Underlying Federal Securities.

The appellants contend the district court erred in finding that they did not have validly perfected security interests in the underlying federal securities. The court based its finding on the following language found in the certificates and disclosure addenda: "Purchaser's interest in the underlying federal security is not perfected and that in the event of insolvency, the customer may only be able to look to the general

assets of the bank and not to the underlying federal security."

The court construed this language as an agreement on the part of the appellants to subordinate their security interests in the underlying securities to the rights of persons who have perfected security interests and to their lien creditors. A lien creditor under Iowa Code section 554.9301, the Uniform Commercial Code (U.C.C.), includes a receiver, in this case the FDIC. In the words of the district court, "[a]nother way to look at it is that the appellants waived their rights to be protected by a perfected security interest."

The court found the repurchase agreement language quoted above to be unambiguous and applied the parol evidence rule to the appellants' stipulated testimony and evidence of Carmody's attempt to perfect their security interests. The court concluded such evidence violated the parol evidence rule because it was offered to vary the language that, according to the court, prohibited perfection. The appellants contend the evidence was not offered for such a purpose but was offered to show that the parties intended, by the agreements, to allow perfection.

The issue for us to decide is whether the court erred in its interpretation and construction of the repurchase agreements. Does the language relied on by the district court constitute an agreement to subordinate or an agreement to waive the right to perfect under the U.C.C.? We conclude it does not.

A. *Legal nature of repurchase agreements.* Before beginning our analysis, we think an explanation of the legal nature of a repurchase agreement transaction[3] would be helpful. One commentator suggests the transaction

> involves the sale of a fractional undivided beneficial interest (a Participation Unit) in a security (an Underlying Security) owned by the bank and issued or guaranteed as to principal and interest by the United States or an agency thereof. The legal title to the Underlying Security remains in the name of the bank or a third party designated by the bank. [Possession is normally transferred to a bailee or trustee.] The term of a Participation Unit does not exceed eighty-nine days and matures on or before (but never after) the maturity of the Underlying Security.
>
> The bank issuing the Repurchase Agreement is unconditionally obligated to repurchase the Participation Unit at maturity for a predetermined amount (the Repurchase Price). Upon maturity of the Repurchase Agreement, the buyer's Participation Unit automatically terminates, at which time the buyer simply holds a contract right to receive payment of the Repurchase Price from the bank. Accordingly, the buyer is never ultimately entitled to receive anything other than payment of the Repurchase Price.
>
> The Repurchase Price equals the original principal amount invested by the buyer plus a premium equal to an agreed upon "interest yield." Payment of the Repurchase Price is made exclusively from the bank's general funds, and is not in any way contingent upon the bank's receipt of the income stream or liquidation proceeds of the Underlying Security. The buyer is thus precluded from sharing in any loss or profit occasioned by fluctuations in the Underlying Security's market value. The bank also grants the buyer a security interest in the Underlying Security. This collateralizes the bank's unconditional obligation to pay the Repurchase Price, and provides an equivalent to federal deposit insurance, which is unavailable.

Porter, *Retail Repurchase Agreements Revisted,* 99 Banking L.J. 676, 679–80 (1982). This discussion accurately explains

---

**3.** Repurchase agreements are classified as either retail or wholesale. Retail agreements involve federal securities with denominations of less than $100,000 and terms of less than 90 days. Wholesale agreements involve short-term contracts and must be in denominations greater than $100,000. Investors in wholesale repurchase agreements tend to be more sophisticated buyers than those dealing in retail agreements. *See* Comment, 36 Am.U.L.Rev. at 669 n. 3. The agreements here are retail.

the legal nature of the property interests created by the repurchase agreements in this case.

B. *Perfection of security interests.* "A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken." Iowa Code § 554.9303(1). Attachment occurs when the debtor has signed a security agreement which contains a description of the collateral, value has been given, and the debtor has rights in the collateral. *Id.* at § 554.9203(1), (2).

■ 1. *Do the underlying federal securities meet the definition of a security under the U.C.C.?* Before getting to the questions of attachment and perfection, we must first decide whether the district court correctly concluded that the underlying federal securities were securities within the meaning of section 554.8102(1)(a). That section pertinently defines a "security" as an instrument that is issued in bearer form. The comments to section 554.8102 suggest that this definition is "functional, rather than formal, and it is believed will cover anything which securities markets, including not only the organized exchanges but as well the 'over-the-counter' markets, are likely to regard as suitable for trading." The comments are evidence of legislative intent. Iowa Code § 554.11109.

As we said earlier, the underlying federal securities are "uncertificated." Treasury regulations allow these securities to be issued through the Federal Reserve System by having Federal Reserve Banks electronically debit and credit its member banks for securities purchased or sold. This eliminates the processing and issuance of paper certificates. Instead of pieces of engraved paper to evidence ownership of a security, electronic impulses, or book-entries, are used. *See generally* 31 C.F.R. §§ 306.115–306.122.[4]

The Mt. Pleasant Bank was not a member of the Federal Reserve System. Hence, it purchased the securities through a broker who caused them to be electronically transferred to the account of Mt. Pleasant Bank's correspondent, UCB, which is a member. Thus, any security interests granted were in these uncertificated securities, which served to collateralize the repurchase agreements.

In addition to the broad language of the comment to Iowa Code section 554.8102, we think, as did the district court and the parties, that Treasury Regulation 306.-118(b) (1974) answers the question whether uncertificated federal securities are securities within the meaning of section 554.-8102(1)(a). The regulation deems such securities to be "bearer definitive form" securities for state law purposes. Treas.Reg. § 306.118(b) (1974) ("For purposes of transfer or pledge hereunder, book-entry Treasury securities maintained by a Reserve bank shall, notwithstanding any provision of law to the contrary, be deemed to be maintained in bearer definitive form."); *see also* Porter, 99 Banking L.J. at 696–700. Thus, uncertificated federal securities like those here are "securities" within the meaning of section 554.8102(1)(a). *See* Porter, 99 Banking L.J. at 700.

■ 2. *Did the appellants have security interests in the underlying federal securities that attached?* One prerequisite to attachment is that the debtor has signed a security agreement. Iowa Code § 554.9203(1). A security agreement includes three basic components: (1) a writing manifesting an intent to create or provide for a security interest,[5] (2) signed by the debtor,[6] and (3) containing a description

---

4. Besides U.S. Treasury notes, the underlying federal securities also include securities of different governmental agencies. Regulations governing these agencies and containing comparable provisions include 12 C.F.R. § 506a.4(b) (Federal Home Loan Bank), 12 C.F.R. § 615.5475(b) (Farm Credit Administration), and 24 C.F.R. § 81.44(b) (Housing and Urban Development).

5. A "security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Iowa Code § 554.1201(37).

6. "Debtor" is defined as "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral...." Iowa Code § 554.9105(1)(d). Clearly, MPB is the debtor in the repurchase

of the collateral.[7] *F.S. Credit Corp. v. Shear Elevator, Inc.,* 377 N.W.2d 227, 231 (Iowa 1985).

The "security agreement" portion of each repurchase agreement provides that MPB "hereby grants to [the purchaser] a security interest in [the underlying federal security] to secure performance of [the repurchase agreement]." Each addendum gives a description of the underlying federal security or collateral which is described as securing performance of the repurchase agreement. MPB appears as a signator to the security agreement portion of the repurchase agreement. Thus, each repurchase agreement contains the "basics" of a security agreement.

No one disputes that the appellants gave value[8] and MPB had rights in the collateral, the other two prerequisites for attachment. Thus, we conclude the district court correctly found that the appellants had security interests in the underlying federal securities that had attached.

3. *Were the security interests in the underlying federal securities perfected?* Having concluded that the appellants' security interests in the underlying federal securities had attached, our remaining inquiry is whether those interests had been perfected. Iowa Code section 554.9305 provides the steps required for perfection of a security interest in an "instrument:"

> A security interest in ... instruments ... may be perfected by the secured party's taking possession of the collateral. If such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in

this Article. The security interest may be otherwise perfected as provided in this Article before or after the period of possession by the secured party.

Although the district court found that the repurchase agreements precluded perfection, it found that UCB's possession would have been sufficient pursuant to section 554.9305 to perfect the appellants' security interests before the FDIC became a lien creditor. According to the district court:

> Section 554.9305 provides that if collateral, such as instruments, is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. Pursuant to Treasury Regulation section 306.118(b) UCB would be a depository because it regularly accepts in the course of its business treasury securities as a custodial service for its customers. The regulation further states "such depository shall, for purposes of perfecting a pledge of such securities or effecting delivery of such securities to a purchaser under applicable provision of law, be the bailee to which notification of the pledge of the securities may be given." [31 C.F.R. § 306.118(b).] Similar language is found in 24 C.F.R. Subtitle A section 81.44(b) (Housing and Urban Development), 12 C.F.R. section 506a.4(b) (Federal Home Loan Bank), 12 C.F.R. section 615.5475(b) (Farm Credit Administration).

> Thus, in order to perfect a security interest in the government securities UCB, as the bailee, had to be notified that the securities had been pledged. MPB, through Mr. Carmody, phoned UCB and wrote them a letter informing UCB that the government securities had been pledged to the [appellants]. UCB then noted that the government securities were "pledged to consumer repo."

---

agreements. It has agreed to repay the purchase prices which are secured by the underlying federal securities.

7. "Collateral" is defined as "the property subject to a security interest." Iowa Code § 554.9105(1)(c). The underlying federal securities here meet this definition.

8. Iowa Code § 554.1201(44)(d) provides that "a person gives 'value' for rights if he acquires them ... generally, in return for any consideration sufficient to support a simple contract."

The secured parties, the [appellants], are deemed to have possession of the collateral from the time UCB received notification of their security interests. *See* [Iowa Code § 554.9305]. This possession would be sufficient to perfect security interests in the government securities.

■ We agree with the district court's analysis. *See* Porter, 99 Banking L.J. at 702 (discussing use of bailment agreement and trust indenture to perfect buyer's security interest). We note that the FDIC takes no issue with this analysis nor with the district court's findings of fact contained in that analysis. Those findings, we think, are supported by substantial evidence.

Left to be considered is the district court's determination that the parties never intended the appellants' security interests to ever become perfected. As we noted earlier, the district court relied heavily on the following language found in the certificates and repurchase agreement disclosure addenda: "Purchaser's interest in the underlying federal security is not perfected and that in the event of insolvency, they may only be able to look to the general assets of the bank and not to the underlying federal securities."

As we also noted earlier, the court refused to consider extrinsic evidence regarding representations by MPB that its debt to the appellants was secured by the underlying federal securities and that the appellants would be protected. The court reasoned that such evidence violated the parol evidence rule because it varied the language precluding perfection.

Whether the district court was correct depends on our review of its interpretation and construction of the repurchase agreements, which we earlier noted are composed of a certificate, a disclosure addendum, and a security agreement. Our review in this respect is "governed by principles of interpretation and construction of contracts generally." *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978).

We defined interpretation and construction in *Fashion Fabrics:* "Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect. Interpretation is reviewed as a legal issue unless it depended at the trial on extrinsic evidence. Construction is always reviewed as a law issue." *Id.*

■ Because the district court refused to consider extrinsic evidence and looked solely to the language in the repurchase agreements in determining their meaning, we review its interpretation and construction as matters of law. *See id.*

Although the district court refused to consider evidence regarding MPB's representations to the appellants and the actions of its president in attempting to perfect the appellants' security interests, such evidence was received. Extrinsic evidence is admissible "as an aid to interpretation when it throws light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain." *Id.* Such evidence is received to "ascertain [a writing's] actual significance," not for the purpose of changing it. *Hamilton v. Wosepka*, 261 Iowa 299, 310–11, 154 N.W.2d 164, 170 (1967); *see also Fashion Fabrics*, 266 N.W. 2d at 26.

We noted the interplay between the parol evidence rule and contract interpretation in *Hamilton:*

[T]he parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is—i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement.... And in the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be ex-

amined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract. Construing a contract of debatable meaning by resort[ing] to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the parol evidence rule. And debatability of meaning is not always discernible at the first reading of a contract by a new mind. More often it becomes manifest upon exposure of the specific disputed interpretations in the light of the attendant circumstances.

261 Iowa at 311–12, 154 N.W.2d at 170–71 (quoting *Garden State Plaza Corp. v. S.S. Kresge Co.,* 78 N.J.Super. 485, 496, 189 A.2d 448, 454 (1963)); *accord Egan v. Egan,* 212 N.W.2d 461, 464–65 (Iowa 1973); *Pappas v. Hauser,* 197 N.W.2d 607, 611 (Iowa 1972).

Considering the extrinsic evidence in this vein, and in light of our interpretation and construction of the repurchase agreements, we think the district court erred in not considering this evidence.

Contrary to the district court's interpretation and construction, we think, for a number of reasons, the parties did intend to allow for perfection of the appellants' security interests in the underlying federal securities. First, we think the language relied upon by the district court could reasonably be interpreted as MPB's attempt to provide adequate disclosure of the true state of facts as they existed at the time the repurchase agreements were signed. At that point the security interests were not perfected. Additional steps for perfection had to be taken, such as giving notice to UCB, as was ultimately done. In the event of insolvency before perfection was accomplished, the purchasers would necessarily have to look to the general assets of the bank. Adequate disclosure would be of prime importance to MPB in light of the Securities and Exchange Commission's position in 1981 that it would apply the antifraud and disclosure provisions of the Securities Exchange Act of 1934 to repurchase agreements. *See* Comment, 36 Am.U.L. Rev. at 686–89.

Second, in a similar vein, our interpretation and construction allowing perfection is in step with federal regulations requiring banks regulated by the Comptroller of the Currency, the Federal Home Loan Bank Board, and the Federal Deposit Insurance Corporation to secure the bank's payment obligation to each buyer by granting a perfected security interest in the underlying federal securities matched to the buyer's repurchase agreement. Porter, 99 Banking L.J. at 689 & n. 72, 694. The district court's interpretation would effectively mean that MPB was in violation of these regulations which were in effect prior to the execution of the agreements. Contracting parties are presumed to contract in reference to the existing law, which becomes a part of the contract. 17 Am.Jur. 2d *Contracts* § 257, at 654–56 (1964). A corollary to this rule requires us to give that interpretation to an agreement that will avoid violation of the law. *See Fortgang Bros., Inc. v. Cowles,* 249 Iowa 73, 80, 85 N.W.2d 916, 920 (1957); 17 Am. Jur.2d *Contracts* § 254, at 647–48. Moreover, the existence of these federal regulations strongly suggests MPB intended the agreements to allow the very thing the law required.

Third, we agree with the appellants that the district court gave a strained interpretation to the language it thought prohibited perfection. The court interpreted the language "is not perfected" to mean "is not *to be* perfected." (Emphasis added.) The court used the latter language to support its construction that the appellants somehow subordinated their security interests or waived their rights to be protected by a security interest. The court in effect added language under the guise of interpretation and construction, resulting in an agreement never contemplated by the parties. No subordination or express waiver language appears in the repurchase agreements. Nor is there any evidence that the parties bargained for either. A fundamental rule of contract construction prohibits a court from making a contract never intend-

ed by the parties. *See Spilman v. Board of Directors*, 253 N.W.2d 593, 596 (Iowa 1977); 17 Am.Jur.2d *Contracts* § 242, at 628.

Fourth, uncontradicted extrinsic evidence supports the interpretation we have accorded the repurchase agreements. MPB officials made statements to the appellants which could reasonably be interpreted to mean that their security interests would be perfected. Several of these officials testified it was their intent in the repurchase agreements that the appellants receive perfected security interests in the underlying federal securities. The evidence also shows the appellants relied on these representations. Moreover, MPB's president subsequently took steps to perfect the appellants' security interests. We usually adopt the practical construction the parties place upon a contract of doubtful meaning, a deficiency permeating these repurchase agreements. *See Federal Land Bank of Omaha v. Bollin*, 408 N.W.2d 56, 61 (Iowa 1987).

Finally, language appears throughout the repurchase agreements consistent with an intent to allow perfection. The security agreement portion of each repurchase agreement provides that each appellant is a secured party. It also provides that in the event of nonpayment, each appellant has the right to direct the sale of the collateral and share in the proceeds of the sale. All of the requirements necessary for the creation of a security interest and to effectuate attachment are covered in the security agreement portion. The addendum has a provision contemplating transfer of the underlying federal security to a bailee or trustee, the last step necessary to effectuate perfection of a security interest. As part of this last provision, it is significant that MPB agrees to "provide continuous notice to the bailee during the term of this agreement to adequately protect purchaser's secured interest in the security."

It seems unreasonable to us that MPB would include all of these provisions and not intend perfection by its repurchase agreements. The whole tenor of these provisions was to ensure protection of each

appellant's security interest. That is precisely the goal the parties were striving to achieve by these provisions. In contrast to the district court's interpretation and construction, ours give meaning to all of these provisions. Principles of contract interpretation and construction require that we give effect to all language of an agreement. *Fashion Fabrics*, 266 N.W.2d at 26. Further, "[b]ecause an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation [that] leaves a part unreasonable, unlawful, or of no effect." *Id.*

We believe the language of the repurchase agreements together with the uncontroverted extrinsic evidence shows, as a matter of law, that the parties intended each appellant's security interest in the underlying federal security to be perfected. *Cf. id.* at 27 ("Insofar as this holding constitutes our interpretation of the [contract] based in part on extrinsic evidence, we think the extrinsic evidence when considered with the language of the writing is so clear no reasonable person could reach a different conclusion."). The district court erred in concluding otherwise.

## IV. *The Claims Involving UCB.*

The appellants also claim that UCB, which had actual possession of the securities, violated its duties to act as a trustee for the appellants' interests and to exercise reasonable care in giving advice to MPB about protecting those interests. The district court dismissed the appellants' cross-claims against UCB, finding that it was not negligent and owed no duty to the appellants. Our decision in the main action means that UCB was not negligent. Thus, we give no further consideration in this opinion to the appellants' assignment of error regarding the district court's dismissal of the cross-claims.

## V. *Disposition.*

By virtue of the repurchase agreement each appellant had a valid security interest

in the underlying federal security that attached and, through subsequent action taken by MPB, became perfected. Perfection in each case occurred before the FDIC was appointed receiver. Hence, each appellant's rights in the underlying federal security are prior and superior to the receiver's for purposes of Iowa Code section 524.-1312(2). Contrary to the district court's interpretation and construction, the repurchase agreements, together with extrinsic evidence, establish as a matter of law that the parties intended each security interest to be perfected. Because the district court erred in this last respect, we reverse and remand with directions for the district court to enter judgment declaring that each appellant has a valid and perfected security interest prior in time and superior to that of the FDIC.

REVERSED AND REMANDED WITH DIRECTIONS.