**GRINNELL MUTUAL REINSURANCE COMPANY, Appellant,**

v.

**Andrew D. VOELTZ, Tiara Voeltz, Michael K. Shannon, and Gwen K. Shannon, Individually and as Parents and Next Friends of Kimberly C. Shannon, a Minor, and Kimberly C. Shannon, Appellees.**

No. 87–1420.

Supreme Court of Iowa.

Nov. 23, 1988.

Richard G. Hileman of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellant.

Steven K. Warbasse, Cedar Rapids, for appellees Voeltz.

Gary D. McKenrick of Gomez, May, McKenrick & Kelly, Davenport, for appellees Shannon.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

The determinative issue in this declaratory judgment proceeding is whether the baby-sitting activities of an insured under a homeowners policy were excluded by the "business pursuit" exclusion of the policy. The district court said they were not and required the insurer to defend and indemnify the insured against a suit for personal injuries suffered by an infant while in the care of the insured. We agree and affirm.

I. *Background Facts And Proceedings.*

In the latter part of August 1984 Andrew D. Voeltz and Tiara Voeltz made application for a mobile home property and liability policy with Barry L. Langley, an agent for Grinnell Mutual Reinsurance Company. This young married couple, who were both in their late teens in August 1984, had never purchased a homeowners policy. Both had graduated from high school in 1983, and neither had any advanced education.

Grinnell issued the policy which, in part, provided the Voeltzes with general comprehensive personal liability protection. The policy was effective as of August 20, 1984, the date of the application.

Beginning in May 1983 Tiara began baby-sitting Joseph Shannon, the child of Michael K. and Gwen K. Shannon. Gwen is Andrew Voeltz's sister.

In June 1985 Tiara also began baby-sitting Kimberly C. Shannon, a daughter born to the Shannons a month before. Tiara baby-sat the two children as well as cared for her own daughter, Tabby, who was born in December 1983.

Beginning in June 1984 the Shannons paid Tiara, on an as-needed basis, $1.75 per hour. That was later reduced to $1.50 per hour. Tiara's 1984 tax return showed that she received $1775 from baby-sitting—all from the Shannons. Tiara did no advertising and held no license, as one is required only if the number of children cared for exceeds six.

In April 1985 Kimberly, while in Tiara's care, was injured. Kimberly had dirtied her diaper. Rather than just changing the diaper, Tiara decided to give the child a bath. Tiara placed the child in the bathtub while the water was running. She left Kimberly temporarily, and during that brief moment the water became hot enough to cause severe burns over twenty percent of the child's body.

In April 1987 Kimberly's parents, individually and on behalf of Kimberly, brought a negligence action against the Voeltzes seeking to recover for the burn injuries

sustained by the child. The Voeltzes notified Grinnell Mutual which in turn denied coverage and then commenced this declaratory judgment action against the Voeltzes and the Shannons. The Shannons were also sued in their capacity as parents and next friends of the minor child. Additionally, the child was sued in her individual capacity.

The declaratory judgment suit seeks a determination that Grinnell Mutual has no obligation to defend or indemnify the Voeltzes because of a "business pursuit" exclusion in the policy. The exclusion provides: "We do not cover bodily injury or property damage arising out of business pursuits of an insured person. But, we will cover activities of that person not ordinarily incident to the business pursuits." The policy pertinently defines "business" as "any full or part-time trade, profession, or occupation."

The district court found that the exclusion was ambiguous, interpreted it against Grinnell Mutual, and concluded that it did not exclude from coverage Tiara's baby-sitting activities. The court then decreed that Grinnell Mutual had an obligation to defend and indemnify the Voeltzes against the pending negligence action. Grinnell has appealed from this decision, contending that the exclusion was not ambiguous and should apply.

We discuss other facts of the case bearing on this issue in connection with our consideration of the applicable legal principles.

## II. *Scope of Review.*

■ Although this is a declaratory judgment action under Iowa Rule of Civil Procedure 267, we review it as any other judgment. Our scope of review is governed by how the case was tried in district court. *See In re Receivership of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 129 (Iowa 1988). This case was tried at law, so our review is on error.

Thus, the district court's findings of fact have the effect of a jury verdict and are binding on us if supported by substantial evidence. *Id.* We construe these findings broadly and liberally. In case of doubt or ambiguity we construe them to uphold, rather than defeat, the judgment. *Kendall/Hunt Publishing Co. v. Rowe*, 424 N.W.2d 235, 238 (Iowa 1988). A corollary rule prohibits us from weighing the evidence or the credibility of the witnesses. *Hamilton v. Wosepka*, 261 Iowa 299, 304, 154 N.W.2d 164, 166 (1967).

■ Evidence is substantial when a reasonable mind would accept it as adequate to reach the same findings. Evidence is not insubstantial merely because it would have supported contrary inferences. *Norland v. Iowa Dep't of Job ·Serv.*, 412 N.W.2d 904, 913 (Iowa 1987).

## III. *Does the Business Pursuit Exclusion Apply?*

The issue here is whether the business pursuit exclusion applies. This raises questions regarding interpretation and construction of the exclusion.

■ Interpretation, the meaning of insurance policy words, is an issue for the court unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence. Construction, the legal effect of a policy, is always a matter of law to be decided by the court. *Connie's Constr. Co. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975); *see also* Restatement (Second) of Contracts § 212 (1981). Extrinsic evidence refers to evidence not contained in the policy—evidence other than the words of the policy. *See Black's Law Dictionary* 529 (5th ed. 1979).

■ In interpreting an insurance policy we seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold. Because insureds have no say in how a policy is written, we interpret ambiguous policy provisions in their favor. Ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty results as to which one of two or more meanings is the proper one. A corollary to this last rule requires the insurer to define clearly and explicitly any limitations

or exclusions to coverage expressed by broad promises. *Moncivais v. Farm Bureau Mut. Ins. Co.*, 430 N.W.2d 438, 441–42 (Iowa 1988).

■ Because of the disparate bargaining statuses of the parties we interpret an insurance policy from the standpoint of an ordinary person, not a specialist or expert. *See Qualls v. Farm Bureau Mut. Ins. Co.*, 184 N.W.2d 710, 712 (Iowa 1971). This rule is part of the broader concept of reasonable expectations we apply in construction of insurance policies. In *Rodman v. State Farm Mutual Automobile Insurance Co.*, we approved the following articulation of that concept: " 'The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' " 208 N.W.2d 903, 906 (Iowa 1973) (quoting R.E. Keeton, *Insurance Law Basic Text* § 6.3(a), at 351 (1971)). In *Rodman*, the insured had not read the policy. There we refused to extend the principle of reasonable expectations if an ordinary person would not misunderstand his or her coverage from a reading of the policy, unless there are other circumstances attributable to the insurer which caused such expectations. *Id.* at 908.

Quoting with approval comment f to section 237 of the Restatement (Second) of Contracts, we refined the concept of reasonable expectations in *C & J Fertilizer, Inc. v. Allied Mutual Insurance Co.* and applied it to the insured's advantage:

> Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation.... [A] party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term ... eviscerates the nonstandard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term....

227 N.W.2d 169, 176 (Iowa 1975).

■ Because this case was tried to the court, the distinction between interpretation and construction becomes important in relation to our scope of review. When, as here, extrinsic evidence is offered for the interpretation of policy words, the court's interpretation if supported by substantial evidence is binding on us. *Connie's Constr. Co.*, 227 N.W.2d at 210. In these circumstances what is intended by a particular policy provision such as an exclusion depends in part on the interpretation of the policy words. Primarily, however, the meaning depends on the understanding of the parties within the context of the transaction. *Wohlenhaus v. Pottawattamie Mut. Ins. Ass'n*, 407 N.W.2d 572, 575 (Iowa 1987).

*Wohlenhaus* is an example of how a facially unambiguous policy provision can become ambiguous because of extrinsic evidence bearing on the situations and expectations of the parties. *See* 407 N.W.2d at 575–76 (exclusion, providing policy was excess if loss was covered by warranty, created fact question precluding summary judgment where extrinsic evidence showed insured paid premium for coverage on newly installed Morton Building). There, we resorted to principles of interpretation suggested by the reporter's note to comments a and b of the Restatement (Second) of Contracts section 212 (1979). *Wohlenhaus*, 407 N.W.2d at 575.

The reporter's note to comment a states: "Cases making a bald 'objective-subjective' distinction often refuse to go further unless an ambiguity is facially apparent.... This approach is deemed simplistic, for the reason stated in this Comment and Comment b." Comment a recognizes that the

relevant intention of a party is that manifested by the party rather than any undisclosed intention. Thus, according to the comment, in cases involving a misunderstanding as to the meaning of an agreement, "there may be a contract in accordance with the meaning of one party if the other knows or has reason to know of the misunderstanding and the first party does not." We recognized this principle in *Hamilton v. Wosepka*, 261 Iowa 299, 306–07, 154 N.W.2d 164, 168 (1967).

Here extrinsic evidence bearing on the meaning of the business pursuit exclusion was offered and received. The district court considered this evidence in interpreting the exclusion to be ambiguous. Our task is to determine whether substantial evidence exists to support the court's interpretation. The operative effect of the exclusion—that is, its construction—still remains a matter of law for our determination.

■ Mindful of the foregoing principles, we have examined the record and conclude that substantial evidence exists to support the court's interpretation. Critical to that interpretation are three documents prepared by Grinnell Mutual. These documents belie the company's contention here that the business pursuit exclusion was not ambiguous.

The first document, called an "Info–Gram," was prepared on March 3, 1980, and was addressed to all agents. It reads in part:

> In the past, we have sent out various publications to our agency force stating our definition of business pursuits under [the policy in question]. Because of the apparent confusion of these previous definitions, we will use this letter to state our interpretation of what constitutes a business activity. We realize this has been a fairly "gray" matter in the past, and we hope to make it a little more black and white.
>
> Under the new "Easy to Read" CPL policy, exclusion 3 specifically excludes bodily injury and property damage arising out of business pursuits of an insured person; however activities of that person

not ordinarily incident to business pursuits are covered. I know if you are like me you never really exactly knew what this meant.

The Info–Gram describes the two elements courts consider essential to constitute a business pursuit: profit motive and continuous activity. The Info–Gram then establishes the following criteria the Company planned to follow in interpreting its business pursuit exclusion: (1) any activity resulting in annual gross receipts in excess of $1000 would be considered a business pursuit subject to the exclusion; (2) any activity not exceeding $5000 in gross receipts would be covered by adding an incidental business activity endorsement, presumably for an additional premium; and (3) any activity exceeding $5000 would require a different liability policy, presumably at a much higher premium. The Info–Gram cites baby-sitting as an activity that would be subject to the new criteria. The document concludes: "I hope I have given you a better understanding of how we will interpret a business pursuit."

The second document, dated the same as the Info–Gram, is entitled "Casualty Interpretation." This document purports to formally set guidelines for following the criteria mentioned in the Info–Gram. It mentions baby-sitting as being subject to these guidelines.

The third document is the agent's manual. The manual's endorsement section under personal liability provides in part:

> Many insureds are involved in activities not contemplated in the basic charge for which coverage is excluded. Coverage may be extended to cover qualifying activities by attachment of an endorsement either at the date of issuance or during the policy term. An additional premium, not subject to short rate or prorate, will be charged for these endorsements. The following are available:
>
> **1) Incidental Business Activity GMRC 1918R**
>
> While there is no coverage for Business Pursuits, coverage is provided without endorsement for incidental businesses conducted by the named insured or

members of his family if annual gross receipts are less than $1,000. For example, baby-sitting, lawn mowing, newspaper delivery.

The endorsement section goes on in the same vein as the Info–Gram and the Casualty Interpretation document. It states that coverage by endorsement is available for certain incidental business activities with annual gross receipts in excess of $1000 but less than $5000. It also states that coverage for such activities exceeding $5000 in annual gross receipts is available in the form of a general liability policy.

Referring to these documents, the district court found that as early as 1980 Grinnell Mutual recognized that the definitions and business pursuit exclusion were ambiguous but took no steps to remove the ambiguity from the policy. It is in this context that the agent dealt with the Voeltzes in 1984. He had been writing homeowners policies for Grinnell Mutual since 1972. He was well aware of the company's undisclosed interpretation of the business pursuit exclusion as it pertained to baby-sitting activities. Yet when he asked about Tiara's occupation and learned that she baby-sat, he made no further inquiries.

At this point the couple did not have a copy of the policy before them, so they were not aware of the exclusion. Instead of informing the couple about the $1000 gross fees limitation regarding coverage of baby-sitting activities, the agent stood mute.

His silence is not surprising in view of Grinnell Mutual's directive to their agents regarding "what if" questions about coverage from potential clients. As to those questions, the following appears under the word "warning" in the agent's policy manual: "Tell the applicant that all coverages are subject to limitations and exclusions. Suggest that he read his policy carefully. Refrain from answering 'What if?' questions." The agent here heeded the warning so well that he neglected to tell the Voeltzes about any limitations or exclusions as he was instructed at the beginning of the warning.

The application for insurance is the only document the couple saw at the time the agent sold them the policy. Section II of the application is entitled "Personal Liability Protection." It shows that the couple purchased liability to the public coverage in the amount of $300,000 for each occurrence. The premium amount for such coverage is shown as twenty dollars. Tiara testified that she thought she had coverage when Kimberly was injured. She further testified that she read the policy for the first time after the company denied coverage.

Given the limited information and the fact that no exclusions or limitations were discussed, the average person would expect to be receiving broad liability coverage. In these circumstances the average person would certainly not expect his or her baby-sitting activities to be excluded if the agent was made aware of these activities and made no further inquiries. *See Cairns v. Grinnell Mut. Reinsurance Co.*, 398 N.W. 2d 821, 825 (Iowa 1987) ("Reasonable expectations ... may be established by evidence of the underlying negotiations or may be inferred from the circumstances under which the policy was provided and issued."). The Voeltzes were a young couple in their late teens with no formal education beyond high school and with no apparent previous experience with homeowners insurance. They certainly can be held to no greater expertise in the field of insurance than the average person.

Grinnell Mutual, of course, is in no position to contend that it had no knowledge of what was said or not said at the time the application was completed. We have said that the knowledge and representations of the soliciting agent are imputed to and binding on the insurer. *Johnson v. United Investors Life Ins. Co.*, 263 N.W.2d 770, 772 (Iowa 1978).

In view of this substantial evidence, several reasonable inferences in support of the district court's interpretation and resulting judgment can be made. Grinnell Mutual knew or had reason to know that: (1) the Voeltzes would expect broad liability coverage, (2) the couple would not expect Tiara's baby-sitting activities to be excluded from

coverage, and (3) the two were unaware of the company's undisclosed interpretation of the business pursuit exclusion.

From our discussion of the evidence and the inferences from it, we draw several conclusions. Clearly, there was a misunderstanding as to the meaning of the business pursuit exclusion, a misunderstanding caused by Grinnell Mutual. The company should have realized that there was a misunderstanding and that the Voeltzes were not aware of it. The company was manifesting an intent that coverage applied while at the same time harboring an undisclosed intent that it did not apply. In these circumstances we hold Grinnell Mutual to its manifested intent and conclude that there was an agreement in accordance with what the Voeltzes reasonably expected—coverage. Accordingly, we affirm the district court's judgment that there is coverage and that Grinnell Mutual has an obligation to defend and indemnify the Voeltzes against the pending lawsuit.

One additional reason supports this result. The accident happened in April 1985. Thereafter, Tiara ceased her baby-sitting activities. Her 1985 income to that point amounted to approximately $500. Grinnell Mutual's $1000 limitation was not reached. Consequently, according to the company's own undisclosed interpretation, the exclusion did not apply.

### IV. *Iowa Cases Involving Business Pursuit Exclusion.*

In upholding the district court's judgment we are not unmindful of our two recent decisions involving the business pursuit exclusion. In *Moncivais v. Farm Bureau Mutual Insurance Co.* we reversed the district court's denial of a summary judgment filed by the insurer and directed that judgment be entered in its favor. The evidence showed that the insured had, at times, up to twenty-five children in her care. The insured did not dispute that her child day care service, which she had operated for fifteen years, constituted a business pursuit. She relied instead on that portion of the exclusion that excepted activities ordinarily incident to non-business pur-

suits, which we held did not apply. 430 N.W.2d 438, 441–42 (Iowa 1988). Thus, the case is clearly distinguishable.

*AID (Mutual) Insurance v. Steffen* presents a closer and more pertinent case. There we affirmed the district court's order granting summary judgment in favor of the insurer. The question was whether the insured's patent litigation was excluded under the business pursuit exclusion. Noting that there was no evidence on the insured's expectations and no circumstances attributable to the insurer which would foster expectations of coverage, we found the insured's reasonable expectations contention to be without merit. 423 N.W.2d 189, 192 (Iowa 1988). The question of interpretation was then one of law, and we concluded an ordinary person would not misunderstand the policy's coverage. *Id.*

In this case, by contrast, there was evidence of the Voeltzes' reasonable expectations of coverage and of conduct on the part of the agent fostering such expectations. Consequently, interpretation of the exclusion was a fact question which the district court correctly resolved in favor of the insured.

### V. *Disposition.*

In summary, we hold that there was sufficient evidence to support the district court's interpretation that the business pursuit exclusion was ambiguous. Any resulting misunderstanding was correctly resolved in favor of the Voeltzes' reasonable expectations of coverage. Finding no error, we affirm.

AFFIRMED.