**PLYMOUTH FARMERS MUTUAL INSURANCE ASSOCIATION,**
Appellant,

v.

**Linda A. ARMOUR f/k/a Linda Rasmussen, Appellee,**

**Robert S. Rasmussen, Jr., Defendant.**

No. 97–1232.

Supreme Court of Iowa.

Sept. 23, 1998.

Stephen F. Avery of Cornwall, Avery, Bjornstad & Scott, Spencer, for appellant.

Duane E. Hoffmeyer of Vakulskas and Hoffmeyer, P.C., Sioux City, for appellee Linda Armour.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

NEUMAN, Justice.

This is a declaratory judgment action brought by plaintiff Plymouth Farmers Mutual Insurance Association (Plymouth) to determine the rights and obligations of the parties under a contract of fire insurance for a home owned by defendant Linda Armour. The home was destroyed as a result of arson committed by Linda's estranged husband, Robert Rasmussen. Plymouth argued before the district court, and urges on appeal, that Linda defrauded the company by falsely claiming title to the premises, thereby voiding coverage. Alternatively, the company claims Robert was an insured under the policy and, therefore, the intentional acts clause of the policy excluded coverage. The district court found the fraud claim meritless and concluded Robert was not an insured so as to prevent coverage. We affirm.

## I. Background Facts and Proceedings.

Linda Armour and Robert Rasmussen were married in 1993. Linda was the sole owner of the home in which they lived. The property had been conveyed to her by Robert in September 1991, while he was involved in divorce proceedings from his former wife, Kristi. The conveyance, however, was not recorded until 1992. Sometime after Linda and Robert were married, Kristi quit claimed her interest in the property to Linda to clear up the title. At the time, Linda and Robert were in the process of securing a home improvement loan.

By April 1996, Linda and Robert's marriage was failing. Linda petitioned for dissolution and secured a temporary writ of injunction restraining Robert from coming onto her property or harassing her at home, work, or by phone. Linda's affidavit accom-

panying the petition revealed a history of domestic violence, including threats by Robert to destroy the residence and commit suicide.

Upon being served with the petition for dissolution and injunction, Robert immediately moved out. He stayed with a female coworker for a month. He then took up residence in a camper shell on blocks at his mother's home. His mother lived next door to Linda. He secured a post office box for mail delivery.

Robert repeatedly violated the injunction. He was sentenced for contempt in late June, but mittimus was withheld on the condition he receive counseling. Further violations occurred, resulting in another contempt hearing scheduled for July 18. Robert failed to appear at the hearing. Two days later, in a fit of anger over the marital breakup, Robert doused Linda's house with gasoline and set it ablaze.

Robert was subsequently convicted of arson. Linda cooperated fully with the prosecution. No allegation was made that she was involved in the crime whatsoever. The dissolution of their marriage was finalized while Robert was incarcerated.

Linda filed a claim for fire loss coverage with her insurer, Plymouth. Plymouth denied coverage on the ground Robert, who intentionally caused the loss, was either a named insured under the policy or an "insured person" as defined by the policy's terms. It nonetheless paid Linda $10,000 for destruction of personal property destroyed in the blaze.

Plymouth later filed this action for declaratory judgment, asserting its right to deny coverage based on the intentional acts exclusion of the policy and seeking recovery of the $10,000 previously paid. In an amendment to the petition—filed and granted the morning of trial—Plymouth alleged that Linda had secured title to the property by fraud, thus voiding coverage.

The case was tried to the court without a jury. Linda testified personally, as did Plymouth's secretary-manager, Robert Kindwall. Two separate depositions of Robert Rasmussen were also received in evidence.

Based on this record, the district court found (1) Plymouth failed to prove its allegation of fraud in the title held by Linda, and (2) Robert was not a named insured and did not meet the definition of "insured person" under the policy because he was not "living with" the insured before, during, or after the fire loss.

■ This appeal by Plymouth followed. Because the action was tried at law, our review is on error. *AMCO Ins. Co. v. Rossman*, 518 N.W.2d 333, 334 (Iowa 1994); *Grinnell Mut. Reins. Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988).

## II. Issues on Appeal.

■ **A. Fraud.** Plymouth's insurance policy provides that coverage will be voided upon proof that an insured "intentionally concealed or misrepresented any material fact" or "engaged in fraudulent conduct" concerning the insurance. Based solely on Robert's deposition testimony, Plymouth asserted at trial that Linda furnished no consideration for the deed from Robert and conspired with him to defraud his former wife. Thus, it argued, Linda's claim of ownership in the residence was fraudulent, voiding the policy.

Linda countered that she and Robert were romantically involved while Robert was separated from Kristi. Kristi was living with her parents, and Robert was financially strapped. Linda agreed to buy his home. She produced receipts, signed by Robert, showing payments for the property and deeds for the conveyances (one deed from Robert, one from Kristi) notarized by neighbors and coworkers. By way of rebuttal, the company offered Robert's testimony—from prison— that the receipts and deeds were manufactured after-the-fact to make it *appear* Linda had purchased the property a year earlier. This was done, he claimed, to shield the property from Kristi during their divorce.

■ The essential elements of an action for fraud are well established: materiality, falsity, representation, scienter, intent to deceive, justifiable reliance, and resulting injury and damage. *See Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996); *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa

1996). For a party claiming fraud to prevail, the proof must be "clear, satisfactory, and convincing." *Janett,* 546 N.W.2d at 619. The district court specifically found Linda's version of the events more credible than Robert's. On appeal in a law action we are bound by such factual findings on the credibility of witnesses. *See Grinnell,* 431 N.W.2d at 785.

Plymouth's allegation of fraud rested entirely on the word of a convicted arsonist, Robert. As noted by the district court, the record reveals ample motive for Robert to discredit Linda. Plymouth failed to tender proof from more objective witnesses; for example, the persons who witnessed and notarized the purportedly "fraudulent" deeds. Given Robert's questionable credibility and Linda's plausible explanation for the transactions, we find no error in the court's verdict for Linda on this ground.

■ **B. *Named insured.*** Robert was the sole named insured with Plymouth for a time prior to his marriage to Linda. After the conveyance to Linda was recorded, the policy was changed to name her as the insured, with Robert as an "additional insured." In April 1996, however, contemporaneously with filing for divorce and applying for the protective order, Linda indicated on her premium payment that Robert's name should be removed as an insured under the policy.

Plymouth nevertheless argues that Robert was still a named insured on the policy at the time of the loss. Its argument is belied by the trial testimony of Robert Kindwall, Plymouth's secretary-manager. On direct examination by Plymouth's counsel, the following exchange took place:

Q. Then did you determine from your records when Linda A. Armour Rasmussen was first added to the policy? A. Yes. It's there in my file.

Q. Okay. I'm going to hand you your file so you can determine that. A. On July 20th, 1992, this policy was changed to Linda A. Armour and also listed Robert Rasmussen as an additional insured signed by Robert Rasmussen.

Q. Then when—or did Robert Rasmussen's name—was his name ever deleted from the policy? A. We deleted it in our office on April 8th of '96 when we received a payment that said a name change, and his name was crossed off. We did that in our computer in our office.

The conclusion is inescapable that Robert was not a named insured on the Plymouth policy covering the property on July 20, 1996, the date of the fire.

■ **C. *Insured person.*** The real issue is whether Robert was, nonetheless, an "insured person" covered by the policy. If so, Linda cannot recover because the policy clearly excludes coverage for intentional loss caused "by or at the direction of any **insured person**. . . ." The policy defines "**insured person**" as "a person living with **you** and related to **you** by blood, marriage, or adoption. . . ." Pertinent to this appeal, "**you**" is defined as "the Insured named in the Declarations and spouse *if living in the same household.*" (Emphasis added.) Robert was indisputably Linda's spouse at the time of the loss. The question is whether he met the additional condition of "living in the same household" as that term is used in the policy.

■ A few fundamental principles guide our analysis. Policy interpretation—the process of attaching meaning to the words used—is a task reserved to the court unless it involves extrinsic evidence or choices to be drawn from reasonable inferences. *Simpson v. United States Fidelity & Guar. Co.,* 562 N.W.2d 627, 629 (Iowa 1997); *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 107–08 (Iowa 1981). When, as here, the court sits as trier of fact and "extrinsic evidence is offered for the interpretation of policy words, the court's interpretation if supported by substantial evidence is binding on us." *Grinnell,* 431 N.W.2d at 786. Words left undefined in a policy are given their ordinary—not technical—meaning. *Rossman,* 518 N.W.2d at 334. When insurance policy language is susceptible to more than one meaning, "the one favoring the insured is adopted." *Id.*

■ The burden of proving an exclusion from coverage falls squarely on the insurer.

*Farm & City Ins. Co. v. Gilmore,* 539 N.W.2d 154, 157 (Iowa 1995); *West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.,* 503 N.W.2d 596, 598 (Iowa 1993). Plymouth points to proof that Robert at all times considered Linda's home his "residence." It urges us to find, as a matter of law, that because they were not yet divorced, they were still part of the same household. To find otherwise, Plymouth contends, would jeopardize the insurability of all spouses living in accordance with temporary orders pending a divorce.

We are not unmindful of the dilemma highlighted by Plymouth. *Cf. Belling v. Harn,* 65 Wis.2d 108, 221 N.W.2d 888, 892 (1974) (during pendency of divorce, parties are encouraged to reconcile and, therefore, temporary orders directing separate living arrangements should not be used to defeat benefits of family insurance protection). Yet in *Vance v. Pekin Insurance Co.,* 457 N.W.2d 589, 592 (Iowa 1990), we embraced the rule that recovery by an "innocent spouse" for a fire loss caused by the other spouse depends "not on property rationales or marital relationships—but on a contract analysis of the insurance policy provisions." *Accord Jensen v. Jefferson County Mut. Ins. Ass'n,* 510 N.W.2d 870, 872 (Iowa 1994).

Although we have not previously interpreted the term "living in the same household" in the context of an intentional loss exclusion, we have considered the term "resident of the named insured's household" in the context of a claim for coverage. *See Rossman,* 518 N.W.2d at 335. In *Rossman,* the plaintiff claimed coverage for personal property damaged by fire while he was temporarily residing with his sister. We observed that "[t]he term 'resident' is not susceptible to one overriding definition." *Id.* We then approved jury instructions patterned after the following three-part test formulated in *Pamperin v. Milwaukee Mutual Insurance Co.,* 55 Wis.2d 27, 197 N.W.2d 783, 788 (1972):

(1) whether the person is living under the same roof; (2) whether there is a close, intimate and informal relationship; and (3) whether the intended duration of the stay is likely to be substantial [and] is consistent with the informality of the relation-

ship, and from which it is reasonable to conclude that the parties would consider the relationship in contracting about such matters as insurance. . . .

*Rossman,* 518 N.W.2d at 335.

Here the district court made a factual finding that Robert did not "reside" with Linda when he committed arson on the property. The court also concluded, as a matter of law, that Robert "was not living in the house before, during, or after the fire loss." These conclusions enjoy ample support in the record. They are consistent with the test we applied in *Rossman* for "resident of the named insured's household," a term we find synonymous with "living in the same household" in the policy before us. Linda discerned her relationship with Robert had so deteriorated that she no longer wanted him under the same roof; the duration of their separation was substantial, eventually becoming permanent; their previously intimate relationship had become arm's length; and for purposes of the insurance contract, she had affirmatively acted—as sole owner of the property—to remove him from the policy's coverage. *See id.*

To summarize, we believe the district court correctly applied the ordinary meaning of the words "living in the same household." Moreover, under the unique facts of this case, the court could reasonably find Robert failed to meet that definition. Accordingly, the court correctly concluded he was not an insured under Linda's policy with Plymouth and, therefore, his intentional acts did not operate to exclude coverage for her loss under the policy.

**AFFIRMED.**