**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A., Plaintiff,**

v.

**TERRA INDUSTRIES, INC. and Terra Nitrogen (UK) Limited, Defendants.**

No. C01–4091–MWB.

United States District Court, N.D. Iowa, Western Division.

Aug. 16, 2002.

Hayward L. Draper, John F. Lorentzen, Nyemaster Goode Voights West Hansell & O'Brien, PC, Des Moines, IA, Eric Portuguese, Lester, Schwab, Katz & Dwyer, New York City, for Plaintiff.

Gregg E. Williams, Jeff W. Wright, Heidman, Redmond, Fredregill, Patterson, Plaza & Dykstra LLP, Sioux City, IA, Andrew R. Running, Thomas L. Campbell, Kirkland & Ellis, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 901
   A. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 901
   B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 901

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 908
   A. Standards For Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 908
   B. General Insurance Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 909
   C. "Property Damage" Under National Union Umbrella Policy . . . . . . . . . . . . . . 911
      1. Iowa law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 911
      2. Other jurisdictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 913
      3. Analysis of National Union's umbrella policy . . . . . . . . . . . . . . . . . . . . . . . 917
   D. "Occurrence" Under National Union Umbrella Policy . . . . . . . . . . . . . . . . . . . 918

*III. CONCLUSION* ................................................... 919

Plaintiff National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union") brings this action for declaratory judgment against its insureds Terra Industries, Inc. ("Terra Industries") and Terra Nitrogen Limited ("Terra Nitrogen") (collectively "Terra" unless otherwise indicated) for a declaration that it has no obligation under a commercial umbrella insurance policy issued by it to indemnify Terra for claims pending in English courts over a benzene contaminated carbon dioxide product sold by Terra Nitrogen in the United Kingdom.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff National Union filed its complaint in this case on August 16, 2001. On August 31, 2001, defendant Terra filed its answer and a counterclaim in which it asserts claims for breach of contract and declaratory judgment against National Union. Specifically, Terra asserts that National Union has breached a commercial umbrella insurance policy issued by it by failing to pay a judgment entered in an English Court against Terra resulting from the sale of a benzene contaminated carbon dioxide product in Great Britain. Terra also seeks a declaration that National Union has an obligation under the umbrella policy to defend Terra against current and future benzene claims and lawsuits, to fund the costs of any appeals associated with the defense of the benzene claims and to indemnify Terra for all current and any future benzene claims in English courts.

On January 16, 2002, Terra filed a motion for summary judgment. On February 19, 2002, National Union filed a cross-motion for summary judgment. The parties subsequently filed their respective resistances to the other's motion.

Pursuant to the parties' requests, the court held oral arguments on the parties' respective cross-motions for summary judgment on July 31, 2002. At the oral arguments, plaintiff National Union was represented by John F. Lorentzen and Stephanie L. Marett of Nyemaster, Goode, Voights, West, Hansell & O'Brien, P.C., Des Moines, Iowa, and Eric A. Portuguese of Lester, Schwab, Katz & Dwyer, New York, New York. Defendant Terra was represented by Andrew R. Running of Kirkland & Ellis, Chicago, Illinois, and Jeff W. Wright of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, Iowa. The parties have filed thorough and extensive briefs in support of their respective positions. Counsel were exceptionally well prepared for oral argument. The oral arguments were spirited and were of substantial assistance to the court in resolving these difficult issues.

The court turns first to a discussion of the undisputed facts as shown by the record, then to the standards applicable to motions for summary judgment and, finally, to the legal analysis of whether either of the parties are entitled to summary judgment on any of the claims at issue in this litigation.

### B. Factual Background

The following facts are undisputed. National Union is a Pennsylvania corporation with its principal place of business in New York. National Union is authorized to transact the business of insurance in Iowa. Terra Industries is a Maryland corporation with its principal place of business in Iowa. Terra Industries is a manufacturer of fertilizer, nitrogen products and methanol. Terra Nitrogen is an indirect wholly-owned subsidiary of Terra Industries, doing business in the United Kingdom. Terra Nitrogen produces fertilizer in the

United Kingdom. A by-product of Terra Nitrogen's fertilizer production is carbon dioxide, which Terra sells for a variety of uses, including the making of beverages.

National Union issued to Terra Industries a commercial umbrella liability insurance policy, policy number BE9325998 ("the National Union Policy"). The policy covered the period of July 1, 1997, through July 1, 2000. Terra has paid more than $3,200,000 in consideration for issuance of the National Union Policy. The National Union Policy covers Terra Nitrogen as a subsidiary of Terra Industries. The National Union Policy lists Terra Industries's address as Sioux City, Iowa, its principal place of business. Approximately twenty-five percent of Terra Industries's sales and production occur in England.

The National Union Policy provides coverage for, among other things, property damage and bodily injury as those terms are defined in the National Union Policy. Specifically, the National Union Policy provides:

> We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

Terra App. Tab 4 at A–100.

The National Union Policy defines "property damage" as follows:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or,

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

Terra App. Tab 4 at A–105. The National Union Policy defines an "occurrence" with respect to property damage as follows:

1. As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured. All such exposure to substantially the same general conditions shall be considered arising out of one Occurrence.

Terra App. Tab 4 at A–104.

The National Union Policy also provides that National Union has "the right and the duty," subject to the terms and conditions of the policy, to provide Terra with a defense against any claim or lawsuit seeking damages against Terra that is covered by the terms of the National Union Policy. Pursuant to Endorsement Number 23, the National Union Policy provides that Terra has the sole discretion to choose legal counsel to defend itself against any claim or suit seeking damages against Terra that is covered by the terms of the policy.

On January 1, 1998, Terra acquired a chemical plant in Severnside, Bristol, England, from ICI. The Severnside plant produced fertilizer by reforming natural gas. One of the by-products of the manufacture of fertilizer through the reforming process is carbon dioxide. The carbon dioxide was sold to Messer UK limited, Hydrogas Limited, and BOC limited (collectively "the Resellers" unless otherwise indicated). The Resellers then sold the carbon dioxide to other companies that incorporated the carbon dioxide into carbonated beverages during the bottling of beverages (collectively "the Bottlers" unless otherwise indicated).[1] Some of the Bottlers then sold

1. While the court will refer to the beverage manufacturing process as bottling and to the

the beverages to other sellers (collectively "the Beverage Sellers" unless otherwise indicated).

On May 18, 1998, Terra learned that benzene had been discovered in a routine sample of carbonated mineral water being tested for importation to the United States. An investigation disclosed that leaks in a C–114 Feed Preheater exchanger at the Severnside plant had permitted some natural gas, which naturally contains benzene, to bypass the reforming section of the plant, where benzene and other impurities would have been removed. As a result, benzene ended up in the carbon dioxide product produced at the Severnside plant. Numerous tests were conducted to determine the nature and extent of the contamination of carbon dioxide produced by Terra. Although the levels of benzene found in the carbon dioxide did not pose a threat to human life, many of the Bottlers and the Beverage Sellers instituted a recall of their products from distributors and retailers.

The Bottlers and the Beverage Sellers asserted claims against the Resellers who, in turn, asserted claims against Terra, seeking to be held harmless from all fees, costs, expenses and damages in connection with the claims. Most of the Bottlers and Beverage Sellers also asserted direct claims against Terra. Terra promptly notified National Union of these claims. Terra's initial defense costs exhausted its $1,000,000 primary policy with CIGNA.

In January 2001, the first of these cases to go to trial in the High Court of Justice, Commercial Court, Queen's Bench Division, in London, England, was *Britivic Soft Drinks, Ltd. and Bass Brewers Ltd. v. Messer UK Ltd. and Terra Nitrogen (UK) Ltd.*, (Case 1999 Folio No. 841) ("the *Britvic* case"). Bass and Britvic argued that

Terra was liable because the carbon dioxide produced by Terra was not acceptable because it contained benzene. On January 31, 2001, while the trial was in progress, National Union agreed to withdraw its reservation of rights to deny coverage, thereby acknowledging it was obligated to provide coverage for any adverse judgement in that case.

On May 9, 2001, Justice Tomlinson issued his bench ruling in the *Britvic* case. Justice Tomlinson provided the following overview of the case:

> This case is concerned with events in 1998, when it was discovered that alcoholic beverages and soft drinks manufactured by U.K. producers including Bass and Britvic were contaminated by benzene. Benzene is a carcinogen and its presence in foodstuffs is therefore unwanted, although it may on occasion be present in small and controlled quantities because of its preservative qualities. The benzene here was present inadvertently in uncontrolled quantities, albeit those quantities were not potentially harmful to health. The benzene was in the $CO_2$ used to carbonate the drinks.

*Britvic*, Case 1999 Folio No. 841 at ¶¶ 5, Terra App. Tab 6 at A–121.

The plaintiffs in the *Britvic* case offered expert testimony from a registered analytical chemist, Dr. Alan Rowley, who, assuming that the carbon dioxide was the source of the benzene, concluded that the carbon dioxide manufactured by Terra had contaminated the beverage products manufactured by the plaintiffs. Dr. Rowley further concluded that the costs involved made removal of the benzene from the beverage products impracticable.

---

manufacturers as "the Bottlers," the court notes that the beverages were processed and

packaged in both bottle and can form.

The plaintiffs in the *Britvic* case also offered evidence to support their contention that introduction of carbon dioxide containing benzene into their beverages caused their beverage products to become unsalable and caused them to recall those beverage products. Geoffrey Alan Wadds, Britvic's former technical director, averred that:

> The products were contaminated with a known carcinogen, even though it was not at levels which could be a risk to health and so we could not afford to take the risk of seeing a report in the newspaper the following day saying that Britvic had decided not to withdraw the affected product.

Wadds's Declaration at ¶ 9, Terra App. Tab 9 at A–312. Dr. Frederick White, Bass Brewers's director of quality assurance, similarly opined that:

> Throughout this incident I was concerned both to protect our customers from drinking any products containing levels of benzene above levels recommended by [the Ministry of Agriculture, Fisheries and Food ("MAFF")] and to protect our brands from adverse publicity. Given the threshold levels quoted by MAFF and the World Health Organization, I believe the recall decision was inevitable and the only responsible course of action open to us once we had found levels of benzene of the quoted maxima.

White's Declaration at ¶ 30, Terra App. Tab 9 at A–323.

Justice Tomlinson found that tests regarding the nature and extent of contamination of carbon dioxide produced by Terra showed that: "The results, and their geographical spread, are clearly indicative that substantial quantities of $CO_2$ produced at Severnside and distributed across the country were contaminated." *Britvic*, Case 1999 Folio No. 841 at ¶¶ 33, Terra App. Tab 6 at A–142–43.

Justice Tomlinson further found that there was substantial evidence that the end beverage products produced by Britvic were contaminated with benzene:

> As to the end product the position is equally complicated. However so far as concerns drinks manufactured by Britvic, products were found with up to 42 ppb benzene present in the end product...At all events Dr. Rowley found clear evidence correlating high benzene levels in Britvic products with the use of Terra Severnside $CO_2$...

*Britvic*, Case 1999 Folio No. 841 at ¶ 34, Terra App. Tab 6 at A–143–144.

Justice Tomlinson also found as follows:

> Accordingly I can conclude with some confidence on the basis of the evidence that over the relevant period, March to mid-May 1998, Terra released from its Severside plant very substantial quantities of $CO_2$ which contained total hydrocarbons very comfortably in excess of 10 ppm measured as methane....I can go further and find with confidence that very substantial quantities of the $CO_2$ released by Terra over the relevant period contained in excess of 10 ppm total hydrocarbons measured as methane where at least 10 ppm of the total hydrocarbon content was accounted for by the presence of benzene alone.

*Britvic*, Case 1999 Folio No. 841 at ¶ 38, Terra App. Tab 6 at A–148–49.

Justice Tomlinson concluded that Messer's liability to Bass and Britvic, and therefore whether Terra was liable to Messer, depended on whether the benzene tainted carbon dioxide rendered the beverage products unsalable:

> The starting point is that the $CO_2$ had to be suitable for a food application. Either it was or it was not. I do not think that a reasonable man would consider the $CO_2$ intended for a food application which had been inadvertently con-

taminated with measurable quantities of a known carcinogen was of a satisfactory standard because one could not reasonably expect the guaranteed exclusion of carcinogens without paying more to the supplier.

*Britvic,* Case 1999 Folio No. 841 at ¶ 77, Terra App. Tab 6 at A–171–72.

Justice Tomlinson further found that Terra's benzene contaminated carbon dioxide, when incorporated into the beverages involved in the litigation, made those beverages "unsalable." Specifically, Justice Tomlinson found that:

Wherever the [maximum acceptable benzene] level is to be set both the amounts of benzene which had been allowed to be present and, of equal if not greater significance, the period over which it had been allowed to be present, ensured that the appropriate level was here on any reasonable view exceeded. This case is not concerned with a breakdown of short duration affecting only a small volume of supply, any impurity in which might if not too gross be diluted out. This case is concerned with sustained supply of CO2 containing what in relative terms are substantial amounts of benzene—substantial because of orders of magnitude greater than the level regarded as permissible by standards since adopted.

*Britvic,* Case 1999 Folio No. 841 at ¶¶ 91, Terra App. Tab 6 at A–179–180. Justice Tomlinson went on to conclude that:

I therefore find it impossible to conclude that a reasonable person would regard the CO2 supplied as meeting a satisfactory standard. Customers would not wish to drink products which had inadvertently been contaminated with a measurable quantity of a known carcinogen, notwithstanding the quantity was not harmful to their health. If the manufacturers had not taken steps to satisfy the public that all reasonable measures

were being taken to recall the batches of production affected all of their production would have very quickly become unsaleable. The affected products themselves were in a real sense unsaleable in the sense that no consumer would knowingly buy them and manufacturers could not as responsible manufacturers be seen to attempt to sell them.

*Britvic,* Case 1999 Folio No. 841 at ¶ 92, Terra App. Tab 6 at A–180–81.

In the *Britvic* case, Justice Tomlinson ruled that Terra was liable to Messer and that Messer was liable to the claimants. Messer was found to be liable to the claimants based on breaches of warranties implied by English statutes. Terra, in turn, was found to have breached the express terms of its contract with Messer. Liability on Terra was also imposed based on the same breaches of warranties implied by English statutes that Justice Tomlinson concluded applied to Messer. *Britvic,* Case 1999 Folio No. 841 at ¶¶ 74, 104–105, Terra App. Tab 6 at A–168–170, 190–193. On June 29, 2001, National Union on behalf of Terra Nitrogen made payment to satisfy the judgment entered in the *Britvic* case.

The second of the benzene cases to go to trial in the High Court of Justice, Commercial Court, Queen's Bench Division, in London, England, was *Bicardi–Martini Ltd. v. Thomas Hardy Packaging Ltd. v. Messer UK Ltd. and Terra Nitrogen (UK) Ltd.,* (Case 1999 Folio No. 1198) ("the *Bicardi–Martini* case"). Justice Tomlinson was again the trial judge.

The facts underlying the *Bicardi–Martini* case were largely the same as those at issue in the *Britvic* case. Bicardi–Martini claimed that Terra was negligent in permitting the carbon dioxide to become contaminated with benzene. Claim Form, *Bicardi–Martini,* Case 1999 Folio No. 1198

at ¶ 8, Terra App. Tab 8 at A–299. The claimant specifically alleged that:

> In consequence of Terra's negligence aforesaid the relevant carbon dioxide contaminated the beverages in respect of which the Claimant claims damages, damaging the same and rendering them unsuitable for human consumption and/or for sale by the Claimant.

Claim Form, *Bicardi–Martini*, Case 1999 Folio No. 1198 at ¶ 9, Terra App. Tab 8 at A–300.

By stipulation of the parties, the relevant findings in the *Britvic* case were deemed to be binding in the *Bicardi–Martini* case. In addition, the parties agreed that the evidence from the *Britvic* case would be adopted as evidence in the *Bicardi–Martini* case. As a result, no live witnesses were called in the second trial. Rather, the second trial consisted of arguments by counsel on the legal issues raised in the litigation: a contractual limitation on Messer's liability to the claimants, and Terra's liability in tort to the claimants.

Terra argues that a contractual limitations provision capped Bacardi–Martini's potential recovery at £500,000. The limitation on liability provision stated:

> Subject to any other limitation or exclusion of liability expressed elsewhere in this Contract, the liability of Messer, its employees and Agents to the Customer in respect to personal injury or direct physical damage to property (and loses, costs and expenses directly arising from such injury or damage), whether through negligence or otherwise, shall be limited to £500,000 in respect of any one incident, except that nothing in this Contract shall restrict Messer's liability to any injured person or his personal representatives for personal injury or death resulting from negligence.

*Bicardi–Martini* Judgment, Case 1999 Folio No. 1198 at ¶ 7, Terra App. Tab 7 at A–251–52. Thus, one issue before the court in the *Bicardi–Martini* case was whether Bicardi–Martini's claims arose from "direct physical damage to property." If, as Terra contended, Justice Tomlinson's ruling in *Britvic*, compelled this result, Terra's maximum exposure would be capped, but if, as the claimants argued, the physical injury was not direct, then no such limitation would apply.

Justice Tomlinson found no direct physical damage to the property and refused to apply the limitation:

> On balance, and not without hesitation, I conclude that Messer's liability to THP is not here in respect of direct physical damage to property. It is some comfort to me to know that that conclusion will, I believe, have absolutely no impact upon the ultimate outcome of the case. Had I concluded that there had been direct physical damage to the property, and that THP's recovery against Messer was restricted to £500,000, I should also consequentially have had to conclude on the basis of the manner in which I was invited to approach this question for the purposes of this case that both Bacardi and THP have a cause of action in tort against Terra pursuant to which they may recover their loss. That conclusion would flow from Terra's acceptance for the purposes of this case that direct physical damage to the product occurred and that Terra owed to THP a duty of care to avoid causing such physical damage, that second concession on the assumption that the property in the product was at the time of damage with THP.

*Bicardi–Martini* Judgment, Case 1999 Folio No. 1198 at ¶ 29, Terra App. Tab 7 at A–272.

Justice Tomlinson's principal rational for not applying the contractual limitation's provision in the *Bicardi–Martini* case was that the benzene contamination occurred

prior to the completion of production of the beverages.[2]

Specifically, Justice Tomlinson offered the following rationale for his decision that the limitations provision did not apply in the *Bicardi–Martini* case:

> Mr. Prynne rightly reminded me of my findings in the Britvic judgment to the effect that the end product was unsaleable in consequence of the introduction of $CO_2$ which inadvertently contained benzene. However, if the reasonable person is asked whether the end product has suffered direct physical damage from the contaminated $CO_2$ his answer ought perhaps be no, because the end product did not exist until after the admixture of the $CO_2$ containing benzene and so therefore it cannot logically have suffered damage from contaminated $CO_2$. Put another way, it cannot therefore be said that the benzene caused direct damage to the Breezer—because the Breezer did not exist when the benzene was introduced into the mixture. The end product here was a product which contained benzene. That end product might I suppose have been damaged had there been, for example, a source of dirt or other contamination to which it was exposed after it had become a finished product but before it was bottled. For example, had there been a defect or breakdown in the bottle washing or bottle preparation unit which caused a batch of bottles to contain a contaminant which rendered the product unsaleable, it would I think probably be appropriate to regard such a case as direct physical damage to the end product.

*Bicardi–Martini* Judgment, Case 1999 Folio No. 1198 at ¶ 22, Terra App. Tab 7 at A–263–64.

In the *Bicardi–Martini* case, judgment was entered against Terra. As a result of the judgment, Terra was required to pay in excess of £3,135,117.47 in damages, interest and attorneys' fees. Terra has demanded that National Union pay this judgment on its behalf. In a letter dated August 3, 2001, National Union refused to pay the judgment, and informed Terra that: "the loss suffered was economic in nature and that there was no physical injury to the property." Terra App. Tab 2 at A–036. National Union, however, did agree to pay the fees and costs of Terra's appeal of the *Bicardi–Martini* case. Justice Tomlinson granted Terra leave to appeal the *Bicardi–Martini* decision.

On April 30, 2002, the Supreme Court of Judicature Court of Appeal unanimously dismissed the appeals in both the *Britvic* case and the *Bicardi–Martini* case. In the *Bicardi–Martini* case the court of appeals concluded that the loss suffered by the claimants was not due to direct physical damage to property. Rather, the court of appeals noted that: The loss arose from uselessness of the finished drinks, and the need for their recall. *Bicardi–Martini* Appeal Judgment, Case No. A3/2001/1385 at ¶ 8, Nation Union Supp.App. at 421. The court of appeals also found that "[w]hat resulted was not damaged concentrate and water, but a defective new product." *Bicardi–Martini* Appeal Judgment, Case No. A3/2001/1385 at ¶ 10, Nation Union Supp.App. at 422. The court of appeals concluded that basis for recovery was for economic loss: "a claim for the costs associated with the recall and destruction of a defective product [is regarded] as essentially a claim for economic loss, rather than for direct physical damage to property." *Bicardi–Martini* Appeal Judg-

---

**2.** Justice Tomlinson also suggested that his decision not to apply the limitations provision was due in part to the structure of the limita-

tions clause itself. *Bicardi–Martini* Judgment, Case 1999 Folio No. 1198 at ¶ 26, Terra App. Tab 7 at A–268.

ment, Case No. A3/2001/1385 at ¶ 11, Nation Union Supp.App. at 422. The remaining claims and lawsuits against Terra are still pending, with trial dates likely to be scheduled in 2002.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to · judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re*

*Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment.

### B. General Insurance Principles

Because the issue of Nation Union's duty to indemnify Terra in the underlying English lawsuits requires an analysis of whether the claims in those English lawsuits involve "property damage," as defined in National Union's umbrella policy, the court must determine whether the definition of "property damage" is ambiguous as it is worded in the policy. The question of whether any term in an insurance policy is ambiguous must be determined by the standards for determination of the ambiguity of terms in an insurance contract. The court therefore will review those standards for determining ambiguity.[3]

The standards for determination of the ambiguity of terms in an insurance contract were summarized by the Iowa Supreme Court in *Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92 (Iowa 1995):

> The construction and interpretation of an insurance policy is a question of law for the court to decide. *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995). The policy is to be construed as a whole, giving the words used their ordinary, not technical meaning to achieve a practical and fair interpretation. *Gracey v. Heritage Mut. Ins. Co.*, 518 N.W.2d 372, 373 (Iowa 1994). When the terms of an insurance policy are ambiguous, we will construe them against the insurer. *Id.* However, the mere fact that the parties disagree on the meaning of a particular term does not establish ambiguity. *Id.* We will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none. *West Trucking Line, Inc. v. Northland Ins. Co.*, 459 N.W.2d 262, 263 (Iowa 1990).

*Morgan*, 534 N.W.2d at 99. The standards stated in *Morgan* are mirrored in innumerable decisions by Iowa courts. *See, e.g., Iowa Comprehensive Petroleum Underground Storage Tank ·Fund Board*

---

3. The parties agree that the court need not make a determination as to a choice of laws in this case because there is no conflict between Iowa and New York law on the issues raised by the parties' cross-motions for summary judgment. The court agrees that there is no "true conflict" between the law of Iowa and the law of New York as to the issues before the court on the parties' cross-motions for summary judgment and therefore the court need not make a choice of law decision. *See Phillips v. Marist Soc'y*, 80 F.3d 274, 276 (8th Cir.1996) ("[B]efore entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states."); *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 736 (8th Cir.1995) (first question was whether there was a "true conflict of laws," and where there was no doubt that case presented a "true conflict," court turned to consideration of which jurisdiction's law should apply under Minnesota conflict-of-laws rules); *Cleary v. News Corp.*, 30 F.3d 1255, 1265 (9th Cir.1994) (court must first determine whether "true conflict" exists between the laws of the jurisdictions); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F.Supp. 1400, 1405 (N.D.Iowa 1995) (noting that before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue). Therefore, the court will apply Iowa law in addressing the issues raised by the parties' cross-motions for summary judgment.

*v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 550 (Iowa 1999); *LeMars Mut. Ins. Co. v. Joffer*, 574 N.W.2d 303, 306–307 (Iowa 1998); *AMCO Ins. Co. v. Rossman*, 518 N.W.2d 333, 334 (Iowa 1994) (holding that policy terms given ordinary meaning as reasonable person would understand them, and disagreement between parties over meaning does not establish ambiguity); *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 108 (Iowa 1981) (holding that disagreement between parties as to terms meaning does not establish ambiguity); *Pappas v. Bever*, 219 N.W.2d 720, 721 (Iowa 1974) (concluding that terms must be given their plain and ordinary meanings); *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa Ct.App.1994) (disagreement of parties as to meaning does not establish ambiguity and terms must be given their ordinary meaning).

In addition to the standards set out in *Morgan,* a few other points regarding determinations of ambiguities in insurance contracts need to be mentioned. Under Iowa contract law, " '[a]n ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty exists as to which of two or more meanings is the proper one.' " *Joffer,* 574 N.W.2d at 306 (quoting *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 298 (Iowa 1994)); *Jensen v. Jefferson County Mut. Ins. Ass'n,* 510 N.W.2d 870, 871 (Iowa 1994) (quoting *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.,* 227 N.W.2d 207, 210 (Iowa 1975)); *Motor Club of Iowa Ins. Co. v. Iowa Mut. Ins. Co.,* 508 N.W.2d 634, 636 (Iowa 1993); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 619 (Iowa 1991); *Iowa Fuel & Minerals v. Board of Regents,* 471 N.W.2d 859, 863 (Iowa 1991); *Nepstad Custom Homes Co. v. Krull,* 527 N.W.2d 402, 405 (Iowa Ct.App.1994); *Tom Riley Law Firm, P.C.,* 521 N.W.2d at 759 (noting that ambiguity exists when a genuine uncertainty exists over two or more meanings of the terms of the contract). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Joffer,* 574 N.W.2d at 308 (citing *A.Y. McDonald Indus., Inc.,* 475 N.W.2d at 619); *Met–Coil Sys. Corp. v. Columbia Casualty Co.,* 524 N.W.2d 650, 658 (Iowa 1994) (same standard) (citing *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987)); *Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc.,* 522 N.W.2d 837, 839 (Iowa 1994) (same standard); *Iowa Fuel,* 471 N.W.2d at 863; *North Star Mut. Ins. Co. v. Holty,* 402 N.W.2d 452, 454 (Iowa 1987) (same standard); *Sandbulte,* 302 N.W.2d at 108 (same standard); *see also Farm & City Ins. Co. v. Anderson,* 509 N.W.2d 487, 491 (Iowa 1993) (formulating the test for ambiguity in an insurance policy as "whether a reasonable person would read more than one meaning into the words," citing *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.,* 484 N.W.2d 192, 194 (Iowa 1992)).

■ It is a "fundamental rule" for interpreting insurance policies that when the meaning of a term in an insurance policy is ambiguous, it must be construed in the light most favorable to the insured. *Cincinnati Ins. Co.,* 522 N.W.2d at 839; *AMCO Ins. Co.,* 518 N.W.2d at 334 ("When the meaning of terms of an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted."); *Jensen,* 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.,* 475 N.W.2d at 619; *North Star Mut. Ins. Co.,* 402 N.W.2d at 454; *Rich v. Dyna Technology, Inc.,* 204 N.W.2d 867, 872 (Iowa 1973) ("Where insurance contracts are ambiguous, require interpretation, or are susceptible to equally proper constructions, the court will adopt the construction most favorable to the insured."); *The Travelers v. Mays,* 434 N.W.2d 133, 134 (Iowa Ct.App.1988) (quot-

ing *Rich* ). The reason underlying this rule is that insurance contracts are contracts of adhesion. *Joffer,* 574 N.W.2d at 306; *Cincinnati Ins. Co.,* 522 N.W.2d at 839; *Jensen,* 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.,* 475 N.W.2d at 619. Again, however, this rule applies only when the terms of the policy are ambiguous or unclear. *Joffer,* 574 N.W.2d at 307; *Farm & City Ins. Co.,* 509 N.W.2d at 490–91.

■ When interpreting insurance policies, a court must " 'seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold.' " *Jensen,* 510 N.W.2d at 871 (quoting *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988)).[4] Thus, in analyzing the definition of "property damage" as it reads in the umbrella policy at issue in this litigation, the question the court must resolve is, "Are the terms of the policy, i.e. 'property damage,' susceptible to two or more meanings?" With this question in mind, the court proceeds to an analysis of the parties' arguments regarding the definition of "property damage."

### C. "Property Damage" Under National Union Umbrella Policy

In Terra's umbrella policy with National Union, the pertinent liability coverage provision provides coverage for "property damage," which is defined as "Physical injury to tangible property, including all resulting loss of use of that property."

Terra claims the damages alleged in the underlying English lawsuits constitute "property damage" and are covered under its umbrella policy with National Union. National Union, on the other hand, asserts that the inclusion of the benzene in Terra's carbon dioxide did not cause physical injury to a tangible property. Thus, it argues that there is no covered "property damage" as that term is defined in the policy. Both parties cite the court to lines of authority which they claim buttress their position. The court will begin its analysis of the definition of "property damage" and whether the claims in the underlying English lawsuits fit within this definition to trigger coverage under Terra's umbrella policy by looking at the applicable law in Iowa and at analogous cases in other states and in other jurisdictions.

### 1. Iowa law

Under Iowa law, the case most closely addressing the issue raised by the parties, whether the integration of contaminated material into a product constitutes "property damage" as defined by the policy, is the Iowa Court of Appeals's decision in *Kartridg Pak Co. v. Travelers Indem. Co.,* 425 N.W.2d 687 (Iowa Ct.App.1988). In *Kartridg Pak Co.,* an insurer claimed it did not have a duty to defend its insured, Kartridg Pak Company ("Kartridg Pak"), in a lawsuit filed by Iowa Meat Fabricators, Inc. ("Iowa Meat"), in that its general liability policy did not provide coverage for any of the claims asserted by Iowa Meat in

---

4. Under Iowa law, the court, not the jury, has the duty to construe contracts. *AMCO Ins. Co. v. Rossman,* 518 N.W.2d 333, 334 (Iowa 1994); *Jensen,* 510 N.W.2d at 871; *Grinnell Mut. Reinsurance Co. v. Voeltz,* 431 N.W.2d 783, 785 (Iowa 1988). Although interpreting the meaning of words in an insurance policy is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen,* 510 N.W.2d at 871; *Voeltz,* 431 N.W.2d at 785. Extrinsic evidence refers to evidence other than the words of the policy. *Jensen,* 510 N.W.2d at 871; *Voeltz,* 431 N.W.2d at 785. Although the parties may disagree on the meaning of a term, that does not establish that the term is ambiguous so as to cause an interpretation of the contract against the maker. *AMCO Ins. Co.,* 518 N.W.2d at 334.

the underlying lawsuit. *Kartridg Pak Co.,* 425 N.W.2d at 688. In the underlying lawsuit, Iowa Meat asserted claims of breach of contract and breach of express and implied warranties against Kartridg Pak. *Id.* at 689. Specifically, Iowa Meat alleged that a mechanical deboner, which it leased from Kartridg Pak, did not perform as promised, resulting in too much bone being "left in the meat to allow it under government regulations to be sold for human consumption." *Id.* at 689. Kartridg Pak contended that the diminished value of the meat created the requisite "property damage" under the policy, and thus, its insurer had an obligation to defend Kartridg Pak in the underlying lawsuit. *Id.* The general liability policy provided the following definition of "property damage":

(1) [P]hysical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or

(2) [L]oss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

*Id.*

The Iowa Court of Appeals found this alleged diminution in value did not constitute "property damage," and noted that "although the failure to sufficiently separate the meat and bone allegedly diminished the value of the backbones, it did not physically injure the product. Thus, this failure cannot support coverage for damages allegedly caused by it." *Id.* at 690. In arriving at this conclusion, the court noted that other courts have found that intangible losses, such as loss of use or diminution of value, are "property damage;" however, those decisions had interpreted policy language defining "property damage" as "injury to tangible property," rather than "physical injury to tangible property." *Id.* at 689 (quoting *American Home Assur. Co. v. Libbey–Owens–Ford Co.,* 786 F.2d 22, 25 (1st Cir.1986) (citations omitted)). The Iowa Court of Appeals went on to note that where courts have interpreted "more recent policies in which property damage is defined as 'physical' injury to tangible property, such courts have held that intangible damages, such as diminution in value, are not considered property damage." *Id.* (quoting *American Home Assur. Co.,* 786 F.2d at 25, in turn, citing *Wyoming Sawmills, Inc. v. Transportation Ins. Co.,* 282 Or. 401, 578 P.2d 1253 (1978), and *Federated Mut. Ins. Co. v. Concrete Units, Inc.,* 363 N.W.2d 751, 757 (Minn.1985)). The Iowa Court of Appeals further recognized that:

the critical difference in policy language is the result of a 1973 revision of the Comprehensive Liability Policy, used by most insurance companies, which expressly added the modifier "physical" injury to the definition of "property damage" in order to restrict recovery for intangible losses.... Under this policy language, some physical injury to tangible property must be shown in order to trigger coverage.

*Kartridg Pak Co.,* 425 N.W.2d at 689 (quoting *American Home Assur. Co.,* 786 F.2d at 25). The court determined the policy in that case reflects "this change in the definition of property damage" and found that the requirement in that policy of "physical injury to or destruction to tangible property" was clear and unambiguous. *Id.* at 690. Thus, the Iowa Court of Appeals concluded that diminution in value that resulted from the inclusion of excess bone did not constitute physical injury to or destruction of tangible property. *Id.*

It is apparent that the clause defining "property damage" in the National Union policy is nearly identical to the clause in *Kartridg Pak* in that the National Union

policy defines "property damage," in part, as "physical damage to tangible property ..." *Kartridg Pak* indicates that property damage may be defined as physical injury, damage, or destruction to tangible property. *Id.* at 690. In addition, because the definition of property damage included the modifier "physical" before injury, damage, or destruction, the Iowa appellate court found that "physical" damage, injury, or destruction to tangible property is required in order to trigger coverage under an insurance policy and an insurer's duty to defend. *See Kartridg Pak Co.*, 425 N.W.2d at 690 (intangible losses, such as diminution in value, do not constitute physical injury to or destruction of tangible property).[5]

While at first glance the *Kartridg Pak* decision would appear to be compelling authority in analyzing the property damage clause in the umbrella policy at issue in this litigation, closer examination of the decision, however, demonstrates that it is not precisely on point. While too much bone being left in the meat in *Kartridg Pak* is analogous to the factual situation here with benzene being left in the carbon dioxide, a significant difference lies in the fact that the contaminated meat in *Kartridg Pak* was not incorporated in another product. This accounts for the reason why the insured in *Kartridg Pak* was claiming that diminution in value constituted physical injury. Here, on the other hand, Terra

is not seeking to recover under its umbrella policy for the carbon dioxide that had been contaminated with benzene, which would be the factually equivalent situation that the Iowa Court of Appeals faced in *Kartridg Pak*. Rather, Terra is seeking coverage for the damage done when its contaminated carbon dioxide was incorporated into beverages. Thus, the issue before the court here is not the same one that was decided by the Iowa Court of Appeals in *Kartridg Pak*. The court, therefore, concludes that Iowa courts have not directly addressed the issue before the court in this case, whether the integration of contaminated material into another product constitutes "property damage." As a result, the court turns to an examination of case law in other jurisdictions in order to address this issue.

### 2. *Other jurisdictions*

In addition to the *Kartridg Pak Co.* decision, National Union relies on a line of cases from other jurisdictions holding that the diminution in the value of a product that results from the inclusion of a defective part does not constitute property damage. *See Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 862–63 (8th Cir. 2001); *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481, 496 (2001); *Aetna Life & Cas. v. Patrick Indust., Inc.*, 645 N.E.2d 656,

---

5.  Previously, where the policy in question defined "property damage" either in sum or in part without the modifier "physical" before damage, injury, or destruction, Iowa courts have recognized insurance coverage for loss of use of tangible property that was not physically damaged. *See, e.g., Ellsworth–William Coop. Co. v. United Fire & Casualty Co.*, 478 N.W.2d 77, 81–82 (Iowa Ct.App.1991) (loss of use of undamaged grain bins was covered loss of use of tangible property where definition of property damage included "loss of use of tangible property which has not been physically injured or destroyed...."); *First New-*

ton Nat'l Bank v. General Casualty Co. of Wis., 426 N.W.2d 618, 626–27 (Iowa 1988) (where multi-peril policy provided two alternative definitions of property damage, one of which required "loss of use of tangible property which has not been physically injured or destroyed ...," and umbrella policy defined "property damage" as an "injury to or destruction of tangible property," loss of property and loss of profits from farming operations sufficed to meet the required definitions of "property damage" under both policies in order to trigger coverage).

661–62 (Ind.Ct.App.1995). Terra, on the other hand, relies on a line of cases for the proposition that the inclusion of contaminated or potentially hazardous material in a product constitutes property damage. *See Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal.App.4th 847, 93 Cal.Rptr.2d 364, 376 (2000); *Aetna Cas. & Surety Co. v. Ply Gem Indus., Inc.*, 343 N.J.Super. 430, 778 A.2d 1132, 1137 (2001). Therefore, the court turns to an examination of these lines of authorities.

In the Eighth Circuit Court of Appeals's decision in *Esicorp*, the insured's assignee brought a lawsuit against the defendant insurer for breach of the duty to defend the insured under a CGL policy issued by defendant insurer. *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d at 861. In the underlying action against the insured, a third party brought a claim for losses arising out of the need to repair defective pipe welds, which were incorporated into a pipe system, that the insured's testing failed to discover. *Id.* The insurance policy at issue in *Esicorp* contained virtually the same definition of property damage as National Union's umbrella policy does here. The Eighth Circuit Court of Appeals, in addressing the question of whether the damages claimed by the plaintiff were covered under the insurance policy, determined that the issue hinged on the terms " 'damages' ... because of 'property damage' " and "physical injury to tangible property." *Id.* at 862. The court observed: "It is significant that the defectively welded pipe sections did not collapse or burst or otherwise cause accidental injury to surrounding property as a result of [the insured's] negligent inspection." *Id.* The insured, however, relied on the incorporation theory, arguing that "the incorporation of the defectively welded pipe sections into the partially completed pipe system was covered property damage, and therefore all direct and consequential costs resulting from that damage are covered losses." *Id.*

The Eighth Circuit Court of Appeals disagreed and determined that the Missouri Supreme Court would reject the incorporation theory; concluding that merely integrating defective pipe into a partially completed pipe system did not constitute property damage. *Id.* The court of appeals found that the insurance policy's definition of "property damage" requires some "physical injury to tangible property" and that the majority of the plaintiff's losses, including all of the repairs to the shop welds, were not covered because the property was not physically injured. *Id.* The court concluded that these expenses "were direct and consequential repair costs, which were not covered property damage," *Id.* at 864.

The facts here are distinguishable from *Esicorp* in that the defectively welded pipes in *Esicorp* could be individually repaired and had not damaged the other parts of the hydroelectric plant. Here, in contrast, the contaminated carbon dioxide could not be removed from the beverages and, as a result, the entire beverage was rendered unsuitable for human consumption due to the incorporation of a known carcinogen into the beverage.

In *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481 (2001), an insurer filed declaratory judgment actions in which it sought declarations regarding its obligations to indemnify its insureds in underlying products liability claims arising out of the failure of a residential plumbing system. *Id.* at 486. The insurer argued that "property damage" does not occur until a particular claimant's plumbing system failed and leaked, causing water damage to the claimant's property. The insureds argued that "property damage" within the meaning of the policies took place at the time of the installation of the allegedly defective system. The court found that "under its plain

and ordinary meaning, the term 'physical injury to tangible property' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Id.* at 502. Based on that definition, the court rejected the argument that the mere installation of a plumbing system into a structure constitutes "property damage." *Id.*[6] The *Eljer* decision is factually opposite of what the court confronts here. Here, in contrast, the contaminated carbon dioxide has already had an effect upon the beverages, infecting the beverages with a known carcinogen and rendering them unsuitable for human consumption.

Finally, in *Aetna Life & Cas. v. Patrick Indus.*, 645 N.E.2d 656 (Ind.Ct.App.1995), the insured bought particle board from a supplier and glued a vinyl covering onto it. The insured then sold the particle board to a manufacturer of camper trailers who installed the particle board in its products. The vinyl covering began peeling off the installed particle board. The manufacturer produced non-defective replacements and replaced the defective products. The insured settled with the manufacturer and then sought coverage from its insurer under a standard CGL policy which defines "property damage" in the same words as does the policy at issue here. The insured argued that the property damage clause provided coverage when the insured supplied defective components to a third party which decreased the value of the final product. *Id.* at 657. The Indiana Court of Appeals noted that previous property damage clauses had been held to provide coverage for claims for diminution of value where the policies' definition read slightly differently: "injury to or destruction of tangible property." *Id.* By specifically qualifying that definition by placing the modifier "physical" before "injury," the Indiana court found that the later definition was intended to exclude coverage for claims " 'such as depreciation in value.' " *Id.* at 660 (quoting *Wyoming Sawmills, Inc. v. Transportation Ins. Co.*, 282 Or. 401, 578 P.2d 1253, 1256 (1978)). The court concluded that: "The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Id.* (citations omitted). Thus, the court declined to hold that "physical injury will be deemed to occur every time a defective component is integrated into another's tangible property." *Id.* at 662.

The facts here are distinguishable from those in the *Patrick* decision. As the court noted above in its discussion of the decision in *Esicorp*, the end product in *Patrick*, the travel trailers, could be individually repaired by removal of the de-

---

**6.** Prior to the Illinois Supreme Court's decision in *Eljer*, the Seventh Circuit Court of Appeals reached the opposite conclusion in its decision in *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805 (7th Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993), a case which also concerned the same plumbing system. The insurer involved in the particular suits at issue in the Seventh Circuit Court of Appeals's *Eljer* decision contended that coverage for such claims was not triggered until a system actually leaked, causing damage to the rest of the residence. *Id.* at 808. The Seventh Circuit Court of Appeals held, pursuant to the very policy language concerning property damage which is at issue in this case, that "the drafting history of the property damage clause, and the probable understanding of the parties to liability insurance contracts, persuade us that incorporation of a defective product into another product inflicts physical injury in the relevant sense on the latter at the moment of incorporation." *Id.* at 814. In its *Eljer* decision, the Illinois Supreme Court expressly rejected the reasoning of the Seventh Circuit Court of Appeals in its *Eljer* decision. *Eljer Mfg. Co.*, 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d at 497.

fective product. Here, in comparison, contaminated carbon dioxide could not be removed from the beverages into which it had been incorporated and, as a result, the entire beverage was rendered unsuitable for human consumption.

While under the *Esicorp–Eljer–Patrick* line of authorities one cannot recover for property damage without physical damage or destruction to tangible property, another line of authorities have arrived at the opposite conclusion with respect to the inclusion of potentially dangerous material within a product. The California Court of Appeals's decision in *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal.App.4th 847, 93 Cal.Rptr.2d 364 (2000) is illustrative of this line of authorities. In *Shade Foods*, a processor supplied almonds that were contaminated with wood splinters. The almond product was used in almond clusters in cereal. Because the nut clusters were composed of congealed syrups and nuts contaminated by wood splinters, the product could not be "somehow deconstructed to remove the injurious splinters and then recombined for their original use." *Id.* at 377. The court of appeals found that loss resulting from the physical linkage of the contaminated nut product resulted in property damage to a third party's product. *Id.* "While the distinction may sometimes be a fine one to draw, we see no difficulty in finding property damage where a potentially injurious material in a product causes loss to other products with which it is incorporated." *Id.* at 376–77. Thus, the wood splinters that were so integrated in the physical composition of the nut clusters caused property damage to the third party's product. The analysis employed in *Shade Foods* would produce the same conclusion in the case of benzene contaminated carbon dioxide being incorporated into carbonated beverages—that the carbon dioxide caused product damage to the beverage products.

In arriving at its decision in *Shade Foods*, the California Court of Appeals relied on a prior decision in *Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co.*, 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690 (1996). In *Armstrong*, the appeals court rejected the insurers' reliance on the rule that physical incorporation of a defective product into another does not constitute property damage unless there is physical harm to the whole. *Id.* at 734. The court of appeals noted that the presence of asbestos causes injury to a building "because the potentially hazardous material is physically touching and linked with the building and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply." *Id.* The court of appeals concluded "that the alleged injury from installation of [asbestos-containing building material] qualifies as 'physical injury to ... tangible property'" under the terms of the standard-form policy. *Id.*

Similarly, in *Johnson v. Studyvin*, 828 F.Supp. 877, 883 (D.Kan.1993), another case involving an installer of asbestos-containing products, the installer placed a spray-on, asbestos-containing textured ceiling in a house and a subsequent owner of the house discovered that the ceiling texture contained the asbestos. Alleging both bodily injury and property damage, the subsequent owner sued the contractor, which sought coverage under the policies of a former insurer. In determining whether there was property damage at the point that the ceiling materials were installed, the district court concluded that "at the moment when a defective product, such as a ceiling texture which is hazardous because it contains asbestos, is attached to some property in a manner that makes it not easily removed, that property is physically injured." *Id.*

This court also notes that in its *Eljer* decision, the Illinois Supreme Court distinguished one of its previous cases involving the installation of asbestos contaminated materials, *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), from *Eljer*. *Eljer*, 258 Ill.Dec. 792, 757 N.E.2d at 498. In *Wilkin*, the Illinois Supreme Court held that "asbestos fiber contamination constitutes physical injury to tangible property, i.e., the buildings and their contents." *Wilkin*, 161 Ill.Dec. 280, 578 N.E.2d at 931. The court explained that the insured property was "physically" injured as a result of the presence of toxic asbestos fibers within the structures, as "the buildings and their contents (e.g., carpets, upholstery, drapes, etc.) are virtually contaminated or impregnated with asbestos fibers, the presence of which poses a serious health hazard to the human occupants." *Id.* Thus, the court concluded that "the contamination of the buildings and their contents" due to the continuous release of these toxins constituted "physical injury" under the policies. *Id.* at 932.

The court finds the decisions in *Shade Foods, Armstrong, Johnson*, and *Wilkin*, more closely resemble the situation in this case, for in each of these cases, the courts concluded that a product was damaged where potentially hazardous materials were incorporated into it. *Shade Foods*, 93 Cal.Rptr.2d at 377; *Armstrong World Indus., Inc.*, 52 Cal.Rptr.2d at 734; *Johnson*, 828 F.Supp. at 883; *Wilkin*, 161 Ill. Dec. 280, 578 N.E.2d at 932.

### 3. Analysis of National Union's umbrella policy

■ The National Union Policy defines "property damage" in relevant part as: "Physical injury to tangible property, including all resulting loss of use of that property." Terra App. Tab 4 at A–105. The phrase "physical injury to tangible property," however, is not defined in the umbrella policy. Nonetheless, the court finds at the terms to be unambiguous. Thus, the court concludes that the Iowa Supreme Court would apply the natural and ordinary meaning of the language of the policy. *See Continental Ins. Co. v. Bones*, 596 N.W.2d 552, 557 (Iowa 1999); *Werner's Inc. v. Grinnell Mut. Reinsurance Co.*, 477 N.W.2d 868, 871 (Iowa Ct. App.1991). In *Eljer*, the Illinois Supreme Court stated that "under its plain and ordinary meaning, the term 'physical injury to tangible property' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Eljer*, 258 Ill.Dec. 792, 757 N.E.2d at 502. The court concludes that the Iowa Supreme Court would reach a similar conclusion and, therefore, adopts that definition.

■ National Union argues that under this definition of "physical injury to tangible property" no property damage occurred because the carbon dioxide did not alter the appearance, shape or color of the chemicals making up the beverages into which it was assimilated. This argument, however, leaves open the question of whether the carbon dioxide laced with benzene altered the beverages in some "other material dimension." While National Union argues that carbon dioxide did not alter the beverage in some other material dimension, the court finds that it did. The carbon dioxide adulterated with a known carcinogen, benzene, rendered the beverages useless for its intended purpose, human consumption. This purpose could not be restored because removal of the benzene was impossible. Thus, like the wood laced nut clusters in *Shade Foods*, and the asbestos intertwined building products in *Armstrong, Johnson*, and *Wilkin*, the court concludes that the beverages were damaged by the introduction of potentially

injurious material, the carbon dioxide containing a known carcinogen.[7]

### D. "Occurrence" Under National Union Umbrella Policy

National Union also argues that there is no coverage under its umbrella policy because Terra cannot demonstrate that the property damage was caused by an occurrence. The National Union Policy defines an "occurrence" with respect to property damage as follows:

1. As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured. All such exposure to substantially the same general conditions shall be considered arising out of one Occurrence.

Terra App. Tab 4 at A–104. The term "accident" is left undefined in the policy.

The Eighth Circuit Court of Appeals observed in applying Iowa law that:

when "accident" is used in the definition of an "occurrence," but left undefined in the policy, the ordinary meaning to be given the term is "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force.... [The term] clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune."

[*Pursell Constr., Inc. v. Hawkeye–Sec. Ins. Co.*], 596 N.W.2d at 70 [ (Iowa 1999).] (quoting *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 448 (Iowa 1970)).

*Norwalk Ready Mixed Concrete, Inc. v. Travelers Ins. Co.*, 246 F.3d 1132, 1136–37 (8th Cir.2001).

■ The court notes that courts have held that where an insured unintentionally sells a defective product that is incorporated into a third-party's finished product, the resulting impairment to the third-party's product is an "occurrence." *See Maryland Casualty Co. v. W.R. Grace & Co.*, 23 F.3d 617, 624 (2d Cir.1993); *Aetna Casualty & Surety Co. v. General Time Corp.*, 704 F.2d 80 (2d Cir.1983); *Chubb Ins. Co. of N.J. v. Hartford Fire Ins. Co.*, No. 97 CIV. 6935 LAP, 1999 WL 760206, at *9 (S.D.N.Y. Sept. 27, 1999), *affirmed*, 229 F.3d 1135 (2d Cir.2000); *Union Carbide Corp. v. Travelers Indemnity Co.*, 399 F.Supp. 12, 20 (W.D.Pa.1975); *Sturges Mfg. Co. v. Utica Mutual Ins. Co.*, 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975); *Thomas J. Lipton, Inc. v. Liberty Mutual Ins. Co.*, 34 N.Y.2d 356, 357 N.Y.S.2d 705, 314 N.E.2d 37 (1974). This is precisely what occurred in this case, with Terra unknowingly selling carbon dioxide laced with benzene to the Bottlers as a result of malfunction at its plant thereby permitting the tainted carbon dioxide to be subsequently incorporated into beverages destined for human consumption.

A case on point presenting virtually indistinguishable facts is the decision in *Chubb Ins. Co.*, No. 97 CIV. 6935 LAP, 1999 WL 760206. In *Chubb*, the insurer

---

7. The court notes that National Union also relies on Justice Tomlinson's conclusion that Messer could not invoke the limitation of liability clause in its contract with Thomas Hardy Packaging, the bottler in the *Bircardi–Martini* case, because Messer had not caused "direct physical damage to property." The court finds this reliance on Justice Tomlinson's decision to be misplaced. The limitation of liability in Messer's contract required "direct physical damage to property," a phrase which does not appear in the umbrella policy's definition of property damage. Thus, Justice Tomlinson's interpretation of Messer's limitation of liability clause is based on a definition of property damage distinct from the umbrella policy before this court.

was found to be obligated to defend the insureds in actions brought against them by Coca–Cola Foods and Tree Top, Inc. for failing to supply one-hundred percent pure apple juice concentrate as per contract specifications. *Id.* at *2. The insurer argued, as does National Union here, that it had no obligation to defend its insureds because the suits were for breach of contract and breach of warranty, and that a breach of contract or warranty could not constitute a covered "occurrence" within the meaning of a commercial general liability insurance policy. *Id.* The district court disagreed and concluded a breach of contract or warranty can be an "occurrence" if, as a result of the breach, property sold by the insured to a third party, which was then incorporated into other property belonging to the third party, caused damage to this other property. *Id.* at *8.

Similarly, in *Aetna Casualty & Surety Co. v. General Time Corp.*, 704 F.2d 80 (2d Cir.1983), the Second Circuit Court of Appeals affirmed the district court's finding that where the insured neither intended nor expected its electric motors to malfunction, the damage caused when the electric motors, which were incorporated into a third party's product, malfunctioned was an "occurrence" within the meaning of a general liability policy and an umbrella policy. *See General Time Corp.*, 704 F.2d at 83. Here, the risk Terra intended to be insured against was the possibility that its products, once completed and sold, would cause bodily injury or damage to property other than the product itself, and for which Terra might be found liable. This is precisely what occurred here. Thus, the

court concludes that events giving rise to the underlying actions constitute an occurrence under the terms of the umbrella policy.[8]

### III. CONCLUSION

The court concludes that the adulteration of Terra's carbon dioxide with benzene which was then sold for incorporation into carbonated beverages destined for human consumption was an "occurrence" within the terms of the National Union umbrella policy and that this occurrence resulted in "property damage" when the adulterated carbon dioxide was incorporated into the beverages making them unsuitable for human consumption. Therefore, the court denies plaintiff National Union's Motion For Summary Judgment and grants defendant Terra's Motion For Summary Judgment. Terra shall be reimbursed by National Union for the damages that Terra has paid with respect to the *Bicardi–Martini* judgement. The court further directs that National Union has a duty under its umbrella policy with Terra to continue to pay for Terra's defense of all benzene claims as well as indemnifying Terra against any judgment or settlement that Terra is required to pay as a result of the benzene contamination.

Like my English colleague in the underlying litigation, Justice Tomlinson, I find the conclusions here are reached "On balance and not without hesitation." *Bicardi–Martini* Judgment, Case 1999 Folio No. 1198 at ¶ 29, Terra App. Tab 7 at A–272. Given the closeness and lack of definitive authority on the issues presented, the

---

**8.** National Union also denies liability based on its contention that the underlying claims do not involve tortuous conduct. National Union's umbrella policy, however, does not limit its coverage solely to tort claims. Rather, the policy requires National Union to:

pay on behalf of the Insured those sums in excess of the Retained Limit that the In-

sured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of ...Property Damage ...that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world.

Terra App. Tab 4 at A–100.

nearly equal strength of legal arguments by both parties, and the substantial amount of money at stake, this court is mindful that this decision will not be nor should it be the last judicial word in this litigation. The parties and this court will all benefit from the wisdom and guidance of the Unites States Court of Appeals for the Eighth Circuit—the inevitable next stop for this case. Likewise, the Eighth Circuit will benefit in its task from the outstanding briefing and arguments of counsel.

**IT IS SO ORDERED.**